Jefferson HILL, Tom Roberts, Paul Marshall. Thomas Schaal, Jr., Charles Vogel, John Greer, Claire Janssen, Daniel Haug, Matthew Montgomery, James Fritcher, Sara Gordon, Don Little, Jr., Greg Wattson, Jeffery Dickerson, Randy Ackerman, and Jeff Roberts, Plaintiffs,

v.

OPUS CORPORATION, a Minnesota corporation, Gerald Rauenhorst T982 Irrevocable Trust f/b/o Grandchildren, Gerald Rauenhorst 1982 Irrevocable Trust f/b/o Children, Keith Bednarowski, an individual, Luz Campa, an individual, Mark Rauenhorst, an individual, and Does 1 through 100, inclusive, Defendants.

No. CV 10–04806 MMM (VBKx).

United States District Court, C.D. California.

Nov. 14, 2011.

---

Charles E. Hill, Greg K. Hafif, Michael G. Dawson, Law Offices of Herbert Hafif APC, Claremont, CA, for Plaintiffs.

Dennis M. Ryan, John B. Gordon, Peter J. Goss, Woodrow T. Roberts, III, Faegre & Benson LLP, Minneapolis, MN, James

Oliva, David F. McDowell, Morrison & Foerster LLP, Los Angeles, CA, for Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

MARGARET M. MORROW, District Judge.

On June 29, 2010, Randy Ackerman, Jeffrey Dickerson, James Fritcher, Sara Gordon, John Greer, Daniel Haug, Jefferson Hill, Claire Janssen, Don Little, Jr., Paul Marshall, Matthew Montgomery, Jeff Roberts, Tom Roberts, Thomas Schaal, Jr., Charles Vogel, and Greg Wattson filed this action against Keith Bednarowski, Luz Campa, Mark Rauenhorst, Gerald Rauenhorst 1982 Irrevocable Trust F/B/O Children ("the Children Trust"), Gerald Rauenhorst 1982 Irrevocable Trust F/B/O Grandchildren ("the Grandchildren Trust"), and Opus Corporation.[1] Plaintiffs allege that they are owed compensation and deferred compensation by their former employer, Opus West Corporation ("Opus West"). They assert that defendants caused Opus West to transfer monies to its parent company, Opus Corporation,[2] which led Opus West to fail and seek Chapter 11 bankruptcy protection.

On July 11, 2011, plaintiffs filed a first amended complaint.[3] On August 29, 2011, defendants filed a motion for summary judgment on plaintiffs' remaining state law and ERISA claims.[4] Plaintiffs opposed the motion,[5] and defendants then filed a reply.[6]

---

1. Complaint, Docket No. 1 (June 29, 2010).

2. Opus West is not a named defendant.

3. First Amended Complaint ("FAC"), Docket No. 58 (Jul. 11, 2010).

4. Motion for Summary Judgment ("Motion"), Docket No. 67 (Aug. 29, 2011).

5. Opposition to Motion for Summary Judgment ("Opp."), Docket No. 71 (Sept. 14, 2011).

6. Reply Memorandum in Support of Defendants' Motion for Summary Judgment ("Reply"), Docket No. 81 (Oct. 31, 2011).

## I. FACTUAL BACKGROUND

### A. History of Opus West, Opus Corp., and Opus LLC

 Opus West Corporation ("Opus West") is a Minnesota corporation wholly owned by Opus Corporation ("Opus Corp.").[7] Plaintiffs are former top executives of Opus West and its subsidiary, Opus West Construction Corporation.[8] Opus West, as well as four other regional subsidiaries of Opus Corp., were "merchant builders." [9] Opus West's objective was to locate land for the construction of investment properties, to design, develop, and build projects while locating tenants to lease them, and to generate profits by selling the developed properties to real estate investors.[10] Chuck Vogel, one of the plaintiffs, characterized Opus West's business as follows: "Opus West was not in the business [of] long-term ownership of the real estate. It was there to design the real estate, build it and sell it upon completion or when it's leased and completed, and realize the development profits from that asset, not ... investment [income] from the long-term ... leas[ing] [of] the property." [11]

7. Defendants' Proposed Statement of Uncontroverted Facts and Conclusions of Law in Support of Motion for Summary Judgment ("Defs.' SUF"), Docket No. 67 (Aug. 29, 2011), ¶ 1; Plaintiff's Response to Defendants Proposed Statement of Uncontroverted Facts and Conclusions of Law ISO Motion for Summary Judgment ("Pls.' SGI"), Docket No. 71 (Sept. 14, 2011), ¶ 1; Declaration of W.T. Roberts III ("W.T. Decl."), Docket No. 67 (Aug. 29, 2011), Exh. A ("T. Roberts's Responses (Set Two)"), Nos. 1 and 3.

8. Defs.' SUF, ¶ 2; Pls.' SGI, ¶ 2; Declaration of James Fritcher in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, Docket No. 71 (Sept. 14, 2011), ¶ 3.

9. Defs.' SUF, ¶ 3; Pls.' SGI, ¶ 3; T. Roberts' Responses (Set Two), Nos. 8–11.

10. Defs.' SUF, ¶ 4; Pls.' SGI, ¶ 4; T. Roberts' Responses (Set Two), Nos. 8–11.

11. Defs.' SUF, ¶ 5; Pls.' SGI, ¶ 5; W.T. Decl., Exh. B ("Vogel Depo.") at 10:10–16. Many of the deposition transcripts submitted suffer from authentication problems. In *Orr. v. Bank of America, NT & SA*, 285 F.3d 764 (9th Cir.2002), the Ninth Circuit set forth clear requirements for the authentication of deposition transcripts in summary judgment proceedings:

"A deposition or an extract therefrom is authenticated in a motion for summary judgment when it identifies the names of the deponent and the action and includes the reporter's certification that the deposition is a true record of the testimony of the deponent. Ordinarily, this would have to be accomplished by attaching the cover page of the deposition and the reporter's certification to every deposition extract submitted. *It is insufficient for a party to submit, without more, an affidavit from her counsel identifying the names of the deponent, the reporter, and the action and stating that the deposition is a 'true and correct copy.' Such an affidavit lacks foundation even if the affiant-counsel were present at the deposition.*" *Id.* at 774 (internal citations omitted, emphasis added)

The deposition transcripts submitted largely fail this test. While they are accompanied by cover pages, none has a signed reporter's certification, and declarants' affirmations that they can attest to the authenticity of the transcript are, standing alone, insufficient under *Orr.*

"[I]n a summary judgment motion proceeding," however, "documents may be authenticated not only through personal knowledge ... but also by any manner permitted by Fed.R.Evid. 901(b) or 902." *Holmes v. Home Depot USA, Inc.*, No. 1:06–cv–01527–SMS, 2008 WL 4966098, *8 (E.D.Cal. Nov. 20, 2008). Documents may be authenticated by "[d]istinctive characteristics and the like," including "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." FED.R.EVID. 901(b)(4).

Considering the contents, nature, and appearance of the documents submitted, as well as explicit references to the deponents within the documents, the court concludes that they are adequately authenticated for purposes of this proceeding. See *Renteria v. Oyarzun*, CV

Opus West's business model was high-risk, high-reward.[12] The company's projects were funded through recourse debt in order to minimize lenders' equity requirements, which allowed the company to leverage its equity and do more projects, [but caused it to] tak[e] on more debt.[13] This business model "magnified the high returns on equity [but led to] additional risk and exposure."[14] For this reason, Opus West reinvested most of its retained net income in new projects.[15] Opus West's highly-leveraged business model was exceptionally profitable—at its peak in 2007, the company grossed approximately $780,641,000 in revenue before imputed taxes of approximately $87,641,000.[16] According to an October 2008 letter written by plaintiff and then-Chief Financial Officer ("CFO") Claire Janssen, Opus West's 2007 net worth exceeded $50,000,000.[17] As Vogel testified, "Opus West always struggled with limited cash. [The company] had sources of cash when we sold property and large uses of cash when we brought property. So the challenge always was to sell property before you bought property."[18] Despite its limited liquidity, Opus West never missed a payment to a lender at any time before 2009, and its employees were paid in full at least through December 31, 2008.[19]

No. 05–392–BR, 2007 WL 1229418, *2 (D.Or. Apr. 23, 2007) (in the absence of evidence showing that the excerpts were fraudulent, deposition transcripts that lacked a copy of the court reporter's certification but did include the cover page identifying the deponent, the action and the time and place of the deposition were sufficiently authenticated under Rule 901(b)(4)); *Prineville Sawmill Co. v. Longview Fibre Co.*, CV No. 01–1073–BR, 2002 WL 31974434, *11 (D.Or. Sept. 23, 2002) (in the absence of evidence showing that they were fraudulent, deposition excerpts that included the cover page of the deposition identifying the deponent, the action and the time and place of the deposition and that were attached to an affidavit in which counsel stated that the excerpts were true copies of the transcripts provided by the court reporter who took the deposition were sufficiently authenticated under Rule 901(b)(4)); *Kenney v. Paderes*, No. Civ. 00–00315 EMK, 2002 WL 31863882, *2 (D.Haw. Aug. 21, 2002) ("Although the transcripts do not contain the reporter's signed certificate, the cover page of the deposition transcripts of both Dr. Allen and Dr. Lauer provide the name of the deponent, the case name and civil number, and indicates that it is a certified copy.... Furthermore, by reviewing its contents, this Court is able to make the determination that the deposition transcripts are authenticated. Fed.R.Evid. 901(b)(4)"). Compare *Orr*, 285 F.3d at 774 ("Nor can [the deposition excerpt of Castle's deposition] be authenticated by reviewing its contents because Castle's name is not mentioned once in the deposition extract," and citing FED.R.EVID. 901(b)(4)); see also *Holmes*, 2008 WL 4966098 at *9 (stating that while a document attached to deposition was not "authenticated in the straightforward, complete way that is customary for depositions," the court would consider the report since "there is evidence warranting a reasonable person in believing that the report is the report he authored"). The court cautions counsel, however, to comply with *Orr's* clear requirements in future submissions.

12. Defs.' SUF, ¶ 6; Pls.' SGI, ¶ 6; T. Roberts' Responses (Set Two). No. 12.

13. Defs.' SUF, ¶ 7; Pls.' SGI, ¶ 7; T. Roberts' Responses (Set Two), No. 12.

14. T. Roberts' Responses (Set Two), No. 12.

15. Defs.' SUF, ¶ 8; Pls.' SGI, ¶ 8; W.T. Decl., Exh. C ("Janssen Texas Depo.") at 260:21–23.

16. Defs.' SUF, ¶ 9; Pls.' SGI, ¶ 9; W.T. Decl., Exh. D ("January 22, 2008, Janssen Memo") at DEFPROD0003126.

17. Defs.' SUF, ¶ 10; Pls.' SGI, ¶ 10; T.W. Decl., Exh. E ("Janssen's Responses to Defendants' Requests for Admissions (Set Two)") at Response 124.

18. Defs.' SUF, ¶ 11; Pls.' SGI, ¶ 11; Vogel Depo. at 18:22–19:2.

19. Defs.' SUF, ¶¶ 12–13; Pls.' SGI, ¶ 12–13; T. Roberts's Responses (Set Two) at Response

Under Opus West's bylaws, the company's board of directors had the authority "to declare any dividends and other distributions upon the shares of the Corporation to the extent permitted by law." [20] Plaintiff Thomas Roberts ("T. Roberts") asserts that, despite this provision, the Board, in reality, "did not have the ability to say 'no' to [a] request" for dividends from the parent company, and that Board approval was a mere "rubber stamp." [21] The Board did not vote dividends of a certain amount; rather, dividends were determined according to a formula. [22] The parties appear to dispute the precise nature of the formula used. Defendants contend that in 2007, as in prior years, the formula called generally for a dividend of 35% of Opus West's consolidated pre-tax earnings, plus pro-forma taxes on those earnings. [23] Plaintiffs assert that Opus West was required to pay "approximately 75% of [its] pre-tax income to

Opus [Corp.] as a dividend distribution," and "another 10% of pre-tax income for charitable contributions." [24]

Opus West had its own accounting staff, led by CFO Janssen, who oversaw the preparation of quarterly financial reports and forecasts that were delivered to Opus West's Board of Directors. [25] Every quarter, Opus West's directors, including plaintiff and former President and CEO Tom Roberts, met to discuss detailed financial and business information that had been approved by Janssen and Roberts. [26]

William McFarland served as an outside director of Opus West. [27] He voted in favor of every dividend resolution during his tenure on the board. [28] He testified that while he believed he possessed the authority to vote against a dividend resolution, he did not know what would have happened had he or another Board member done so. [29]

131; T.W. Decl., Exh. F ("T. Roberts Depo.") at 44:2–6.

**20.** Defs.' SUF, ¶ 16; Pls.' SGI, ¶ 16; T. Roberts's Responses (Set Two) at Request and Response 67.

**21.** Declaration of Thomas Roberts In Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("T. Roberts Decl."), Docket No. 71 (Sept. 14, 2011), ¶ 8. Roberts contends Board members would have been fired had they objected to declaring a dividend. This appears to be a statement of opinion, and is not supported by facts. (*Id.*)

**22.** Defs.' SUF, ¶ 17; Pls.' SGI, ¶ 17; T. Roberts Depo. at 90:17–21.

**23.** Defs.' SUF, ¶ 18; Pls.' SGI, ¶ 18; W.T. Decl., Exh. H ("November 3, 2007, Opus West Board Minutes").

**24.** Pls.' SGI, ¶ 18; T. Roberts Decl., ¶ 8.

**25.** Defs.' SUF, ¶ 20; Pls.' SGI, ¶ 20; T. Roberts' Responses (Set Two), Nos. 48, 49, 52, 54, and 58.

**26.** Defs.' SUF, ¶ 21; Pls.' SGI, ¶ 21; T. Roberts' Responses (Set Two), Nos. 65–66.

**27.** Defs.' SUF, ¶ 22; Pls.' SGI, ¶ 22; T.W. Decl., Exh. I ("McFarland Depo.") at 6:6–20.

**28.** Defs.' SUF, ¶ 25; Pls.' SGI, ¶ 25; McFarland Depo. at 6:6–20.

**29.** Defs.' SUF, ¶ 26; Pls.' SGI, ¶ 26; McFarland Depo. at 12:3–22. McFarland testified as follows:

"Q: When the dividend distribution vote would come up to the board, did you ever vote against it?
A: No.
Q: Did you ever feel that you could vote against it?"
A: Well, I felt I could.
Q: But you never did?
A: Never did.
Q: What made you feel that you could vote against it?
A: Well, there was nothing that prohibited voting yes or no.
Q: If you voted no, what do you think the ramifications would have been?
A: Probably more discussion. I don't know beyond that.
Q: Okay. Can you ever remember a time where anybody on the board voted no to the dividend distribution?

None of the other directors ever voted against a dividend resolution either.[30] Opus West paid its last dividend on March 15, 2008, based on 2007 results.[31]

 Opus West consistently ranked first or second among the five regional operating companies.[32] As Vogel stated:

A: No."

30. Defs.' SUF, ¶ 27; Pls.' SGI, ¶ 27; T. Roberts Responses (Set Two) No. 68. Defendants also cite further testimony by McFarland:

"Q: ... stamping whatever resolution was put in front of them?
A: No, I don't think so.
Q: Why not?
A: We had a lot of discussion about it before we had the vote. So we—it wasn't just rubber stamping, we exercised our diligence." (McFarland Depo. at 34; 1–2.)

This testimony appears on page 34 of McFarland's deposition; the excerpts provided skip from page 21 to 34. The pages that provide background and context for this question are missing, and the court cannot discern the subject to which McFarland had reference when he offered this testimony, or whether it supports defendants' factual assertion. Consequently, the court disregards the statement.

31. Defs.' SUF, ¶ 29; Pls.' SGI, ¶ 29; T. Roberts Depo. at 77:15–20.

32. Defs.' SUF, ¶ 31; Pls.' SGI, ¶ 31; W.T. Decl., Exh. K ("Little Depo.") at 42:14–15.

33. Defs.' SUF, ¶ 33; Pls.' SGI, ¶ 33; Vogel Depo. at 17–22.

34. Defs.' SUF, ¶ 34; Pls.' SGI, ¶ 34; Declaration of Dennis Power in Support of Defendants' Motion for Summary Judgment ("Power Decl."), Docket No. 67 (Aug. 29, 2011), Exh. Z ("Table of 2007 Earnings"). Defendants proffer evidence concerning the amounts Vogel and T. Roberts were paid. (See Defs.' SUF, ¶¶ 35–36.) Plaintiffs object to the admission of the evidence on relevance and privacy grounds. Defendants have not demonstrated that the evidence is relevant to any material fact in dispute. Evidence is only relevant if it has a tendency to demonstrate that the existence of a material fact is more or less probable. See FED.R.EVID. 401 ("'Relevant evidence' means evidence having

"I can tell you that the dividends created over the last several years of the company were gigantic, and the money that was sent [to Opus Corp.] was based on the success of the company. My deferred compensation was earned based on the success of the company...."[33] The plaintiffs were paid varying amounts.[34]

any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"); FED.R.EVID. 402 ("All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible").

Defendants contend that because plaintiffs "deny any role in the alleged wrong doing and [assert] that Defendants were solely responsible ... it is relevant that they were handsomely rewarded with sums in the millions." (Defendants' Response to Plaintiffs' Objections to Evidence Cited in Defendants' Proposed Statement of Uncontroverted Facts and Conclusions of Law, Docket No. 81 (Oct. 31, 2011).) For the first time in their reply, defendants also raise an *in pari delicto* defense to plaintiffs' claims for restitution under the UCL, California Business & Professions Code § 17200, et seq. (Reply at 8–9.)

The court declines to consider arguments raised for the first time in reply, since the other party has no opportunity to respond. See *Ellison Framing, Inc. v. Zurich American Ins. Co.*, No. CIV. S–11–0122 LKK/DAD, 2011 WL 1322387, *5 (E.D.Cal. Apr. 4, 2011); *Stewart v. Wachowski*, No. CV 03–02873 MMM, 2004 WL 2980783, *11 (C.D.Cal. Sept. 28, 2004) (refusing to consider an argument raised for the first time in reply); *Halliburton Energy Services, Inc. v. Weatherford International, Inc.*, No. Civ.A. 302CV1347–N, 2003 WL 22017187, *1 n. 1 (N.D.Tex. Aug. 26, 2003) ("Halliburton offers additional grounds for reconsideration in its reply[;] however, the grounds are not proper under Rule 59(e) ... and the Court will not consider an argument raised for the first time in a reply brief"); *Ferguson v. City of Phoenix*, 931 F.Supp. 688, 696 (D.Ariz.1996).

Even were the court to consider the argument, it is not apparent that plaintiffs' salaries

## B. The Benefits and Deferred Compensation Plans In Question

█ Plaintiffs' complaint is based on certain benefits and deferred compensation plans specifically tailored for a select group of highly compensated employees.[35]

and the amount of deferred compensation they earned prior to filing this action is necessarily probative of "wrongdoing" on their part. All it demonstrates is that they were paid well for their work with the company. Defendants neither assert nor proffer evidence that the money plaintiffs were paid compensated them for fraudulent activity, or that the payments were somehow improper. Consequently, the court excludes evidence of plaintiffs' compensation.

35. Defs.' SUF, ¶ 40. Pls.' SGI, ¶ 40; Plaintiffs participated in Opus West's qualified retirement plan, which is fully funded and held in trust by a third party for its beneficiaries pursuant to Internal Revenue Code § 401(a). (Defs.' SUF, ¶ 38; Vogel Depo. at 72:17–22.) Plaintiffs do not make any claims concerning this funded retirement plan.

36. Defs.' SUF, ¶ 41; Pls.' SGI, ¶ 41; W.T. Decl., Exh. L ("Plaintiff Thomas Roberts's Requests for Admission (Set One)"), No. 6.

37. T. Roberts testified at some length regarding the unfunded nature of the benefits allegedly owed:

"Q: So what's at issue in this lawsuit is the deferred comp, the SARs and the bonuses that Opus West has failed to pay you, is that correct?
A: Yes.
Q: And it's your understanding that as to the deferred comp, the SARs and the bonuses, that there were never any amount[s] set aside by Opus West to pay for those, to make those payments, am I correct?
A: Yes.
Q: And you were aware of that during the entire time that you were CEO of Opus West, were you not?
A: Yes.
Q: That is you knew during the entire time that you were CEO of Opus West that there were no funds segregated for any of those payments, am I correct?
A: Yes.

It is undisputed that these plans were unfunded by design.[36] Compensation under the plans was to be paid from Opus West's general corporate assets.[37] One of the ERISA plans discussed in the complaint, for example, is the Opus West Stock Appreciation Right ("SAR") plan.[38]

MR. HAFIF: I'm going to object to the words "funds segregated" as vague and ambiguous. Do you mean, I think what you are referring to in the question, in other words, is [was] it ... unfunded?
BY MR. GORDON:
Q: That is the ultimate conclusion, right, but I'm going to get there through my own plodding way. But, yes, I totally agree with that, they were unfunded, were they not, Mr. Roberts?"
A: Yes.
Q: And they were always unfunded?
A: Yes.
Q: And those were paid out of Opus West's general funds, were they not?
A: Yes.
Q: They didn't come out of any special account or trust or fund of any kind, am I correct about that?
A: Yes.
Q: Did Opus West Corporation have any sources of funds to pay SARs benefits other than its general revenues that you are aware of?
A: No.

...

Q: So every time that Opus West had a need to pay funds under any of these plans, it went to its general corporate funds to get that money, am I correct?
A: Yes." (W.T. Decl., Exh. YY ("T. Roberts Depo.") at 22:16–32:12.)

Confirming that payments were to come from the general assets of the corporation, plaintiffs have filed unsecured creditor claims in Opus West's bankruptcy proceeding. (Defs.' RJN, Exhs. GG–SS) Additionally, at the hearing on defendants' motion to dismiss the first amended complaint, plaintiffs' counsel conceded that all of his clients' claims were based on unfunded plans.

38. Although plaintiffs' complaint contains allegations regarding the SAR Plan, their ERISA claim is not based on the plan. Plaintiffs contend that Opus Corp. and Opus LLC, as well as Opus West, were required to pay benefits under the 80/20 Plan and Presidents

This plan was "designed to provide the participant with approximately the same economic benefit[ ] he would realize if he were holding a ... number of shares in the company [equal to] the number of SARs awarded to him.... The value of the SARs depend on how profitable the company has been since the SARs were awarded." [39] The SAR plan thus permitted its participants to enjoy equity-like gains without the risk and tax obligations of actual shareholders.[40] The purpose of the SAR plan was to provide an incentive for Opus West's senior management to perform "exceptional services" and devote their full abilities to the success of Opus West.[41] It defines Opus West, and any entity that succeeds to its business through merger, consolidation, acquisition of all or substantially all its assets, or any other means, as the "Company," so long as the successor entity elects in writing, within a reasonable time after succession, to continue the Plan.[42] The SAR Plan provides that an employee of Opus West or one of its affiliates will become a participant when a committee, in its sole discretion, designates the employee to receive an award under the Plan.[43]

Plaintiffs' ERISA allegations are not based on the SAR Plan, however, but on two other plans. The first of these is the "Opus 80/20 Plan for Officers." [44] This plan was established to provide future compensation to certain highly-paid employees through the deferral of incentive compensation.[45] The 80/20 Plan refers to Opus Corp. and Opus LLC as the "Companies"; it denominates each of entities indi-

---

Plan that form the basis for their ERISA claim. (Opp. at 16 et seq.) They seek to introduce the SAR Plan as extrinsic evidence to show it unambiguously states that only Opus West is responsible for payments under the plan, and to argue that when the Opus Group of Companies wanted to indicate that only Opus West had an obligation to pay, they knew how to do so.

39. Defs.' SUF, ¶ 42; Pls.' SGI, ¶ 42; W.T. Decl., Exh. M ("Summary of SAR").

40. Defs.' SUF, ¶ 43; Pls.' SGI, ¶ 2; Summary of SAR.

41. Plaintiffs' Proposed Statement of Uncontroverted Facts ISO Opposition to Defendants' Motion for Summary Judgment ("Pls.' SUF"), Docket No. 71 (Sept. 14, 2011), ¶ 1. As evidence of this, plaintiffs proffer the SAR Plan attached to the Greg Hafif's declaration. (See Declaration of Greg Hafif in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Hafif Decl."), ¶ 13, Exh. 6 ("SAR Plan").) Hafif's declaration contains no information indicating that he has personal knowledge of the exhibit or that he can authenticate it. Defendants do not object to consideration of the document on this basis, however; consequently, the court considers the objection waived. The exhibit contains handwritten notations on page 2.

The court excludes this handwriting as hearsay. See Fed.R.Evid. 801(c) (" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"); Partido Revolucionario Dominicano, Seccional Metropolitana de Washington–DC v. Partido Revolucionario Dominicano, Seccional de Maryland y Virginia, 311 F.Supp.2d 14, 16–18 (D.D.C.2004) (excluding handwritten notations on a document as hearsay).

42. Pls.' SUF, ¶ 2; SAR Plan, Art. I, § 1.1.

43. Pls.' SUF, ¶ 3; SAR Plan, Art. II, § 2.7.

44. Pls.' SUF, ¶ 4; Declaration of James Fritcher In Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Fritcher Decl."), ¶ 9, Exh. 5 ("80/20 Plan"). Defendants also proffer a copy of this plan with their request for judicial notice. (Defendants' Request for Judicial Notice In Support of Defendants' Motion for Summary Judgment ("Defs.' RJN"), Docket No. 69 (Aug. 29, 2011), Exh. VV ("80/20 Plan")). Neither party has objected to the version of the plan document submitted by the other.

45. 80/20 Plan, Art. I, § 1.2.

vidually as the "Company."[46] The 80/20 Plan establishes an "Account" for each eligible participant, which reflects the amount of deferred incentive compensation owed.[47] An employee is eligible to become a participant on the earliest date on which he or she is deemed a "qualified employee."[48] The Plan provides that the Companies will maintain sub-accounts for each participant that reflect the employee's annual award for each year of the plan as well as interest.[49] The deferred compensation credited to a participant's account is allocated as of the annual award date for that plan year.[50] The 80/20 Plan provides that it can be amended in whole or in part at any time, for any reason, by "the Company's" Board of Directors.[51] No amendment can eliminate the right of a participant to receive the balance of his or her "vested" account, which is determined as of the date the amendment is adopted.[52] An amendment can, however, modify or eliminate the deferrals under Section 4.1 and/or the interest under Section 4.3 that would otherwise be allocated to the participant's account, to the extent permitted by

[IRS] Code Section 409A and accompanying regulations.[53] The plan also specifies that "[a] Participant's credit in his or her Account shall be an unsecured obligation of the respective Company (or subsidiary or affiliate) to pay the Participant [or the Participant's beneficiary] the actual amount of the credits . . .," and also that "[e]ach Participant or Beneficiary is only a general creditor of the Company (or subsidiary or affiliate) with respect to his or her Account."[54] The plan states that "[a]ccounts are maintained for recordkeeping purposes only."[55]

The second plan on the ERISA claims are based is the "Presidents Deferred Compensation Plan" or "Presidents Plan." The parties proffer three different versions of this plan. The first was submitted with defendants' request for judicial notice, and is titled the "Opus Deferred Compensation Plan for Operating Subsidiaries."[56] Plaintiffs proffer a version of the plan titled "Opus Annual Incentive Plan for Operating Subsidiaries"; Roberts asserts that this is the "Presidents Deferred Com-

---

46. Pls.' SUF, ¶ 6; Fritcher Decl., ¶ 9; 80/20 Plan, Art. I, § 1.4. Opus LLC is a Minnesota limited liability company. (Pls.' SGI, ¶ 6.)

47. Pls.' SUF, ¶ 7; Fritcher Decl., ¶ 9; 80/20 Plan, Art II, § 2.1.

48. Pls.' SUF, ¶ 8; Fritcher Decl., ¶ 9; 80/20 Plan, Art II, § 3.1.

49. 80/20 Plan, Art II, § 2.1.

50. Pls.' SUF, ¶ 9; Fritcher Decl., ¶ 9; 80/20 Plan, Art. IV, § 4.2.

51. Pls.' SUF, ¶ 10; Fritcher Decl., ¶ 9; 80/20 Plan, Art. VII, § 7.1. The text of the plan does not specify whether "Company" refers to Opus Corp. or Opus LLC.

52. 80/20 Plan, Art. VII, § 7.1.

53. *Id.* The 80/20 Plan states that every person receiving benefits under the plan is presumed

to be mentally competent until the date on which the Company receives a written notice that such person is incompetent and that a guardian, conservator, or other person legally vested with the person's care has been appointed. (Pls.' SGI, ¶ 11; Fritcher Decl., ¶ 9; 80/20 Plan, Art VIII, § 8.2.) Once such a notice is received, the Company may direct benefits payments to the guardian or conservator, and any such payments made are deemed to discharge completely the Company's obligations. (*Id.*)

The deferrals in Section 4.1 refer to the formula used to determine whether a plan participant receives incentive compensation that year, or has their compensation placed into a deferred account. (*Id.*, Art. VI, § 4.1).

54. 80/20 Plan, Art. IV, § 4.4.

55. *Id.*

56. Defs.' RJN, Exh. VV.

pensation Plan."[57] Roberts also proffers what he contends is the "original" version of the plan, titled the "Opus U.S. Corporation and Opus U.S. L.L.C. Annual Incentive Plan for Operating Subsidiaries."[58] Plaintiffs rely heavily on this "original" version of the plan in support of their argument that it was the intent that both Opus Corp. and Opus LLC were to be bound by the plan. Defendants contend that the "original" version plaintiffs proffer is in fact a "prior version of a different plan" that is not covered by ERISA.[59] This assertion is supported by the language of the two plans plaintiffs proffer. Both state that Minnesota law, not ERISA, governs. In contrast, the 80/20 Plan, the terms of which are not disputed, clearly states that ERISA governs.[60]

In their reply, defendants assert that "[t]he parties agree that the current, operative plans are those attached as exhibits VV and WW" to defendants' request for judicial notice.[61] When discussing the current version of the plan, moreover, plaintiffs repeatedly cite Exhibit WW as the Presidents Plan. See *Gospel Missions of America v. City of Los Angeles*, 328 F.3d 548, 557(9th Cir.2003) ("We have discretion to consider a statement made in briefs to be a judicial admission, binding on both this court and the trial court." (internal citations omitted)); *American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir.1988) ("For purposes of summary judgment, the courts have treated representations of counsel in a brief as admissions even though not contained in a pleading or affidavit"); *Kosen v. Ruffing*, No. 08cv0793–LAB (WMC), 2009 WL 56040, *8 (S.D.Cal. Jan. 7, 2009) ("Additionally, 'statements of fact contained in a brief may be considered admissions of the party in the discretion of the district court,'" quoting *Lacelaw Corp.*, 861 F.2d at 226); cf. *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, No. 98–4284, 1999 WL 1021852,*4 (6th Cir. Nov. 3, 1999) (Unpub. Disp.) ("If an affidavit is ... inconsistent with a party's prior discovery responses, the affidavit is inadmissible and should not be considered"). As there appears to be no factual dispute that defendants' preferred version of the Presidents Plan is the current one, the court interprets its terms.

▮ Although plaintiffs contend that Opus Corp. and Opus LLC are responsible for making payments under the 80/20 Plan and the Presidents Plan, those entities did not pay any compensation under either plan. In 2008 and 2009, payments under the 80/20 Plan were made by either Opus West, or Opus Core LLC ("Opus Core"), a "pass-through" entity created to maintain the confidentiality of compensation paid to participants under various compensation and deferred compensation plans.[62] Plaintiff T. Roberts' compensation under the Presidents Plan was paid by Opus Core.[63]

---

**57.** T. Roberts Decl., ¶ 3, Exh. 1.

**58.** T. Roberts Decl., ¶ 4, Exh. 2.

**59.** Defendants' Response to Plaintiffs' Proposed Statement of Uncontroverted Facts and Conclusions of Law In Support of Opposition to Defendant's Motion for Summary Judgment, Docket No 80 (Oct. 31, 2011). Defendants object to consideration of plaintiffs' versions of the plans as irrelevant on the basis that they are not the plan in question.

**60.** T. Roberts Decl., Exh. 1, Art. I, § 1.7; *Id.*, Exh. 2., Art I, § 1.7.

**61.** Reply at 14.

**62.** Defs.' SUF, ¶¶ 44–45; Pls.' SGI, ¶¶ 44–45; FAC, ¶ 117; Power Decl., ¶ 4. (*stating that in years 2007 and 2008, "[n]o other Opus entity, including Opus Corp. or Opus LLC paid ... deferred compensation" from the 80/20 Plan*).

**63.** Power Decl., ¶¶ 9–10. Plaintiffs offer John Greer's testimony that Tim Becker, CEO of

## C. The Collapse of Opus West, the Subsequent Bankruptcy Litigation, and The Plaintiffs' Claims in the Instant Litigation

The parties offer competing narratives regarding the reasons for Opus West's collapse. Defendants contend that the downturn in the real estate industry, as well as the implosion of financial markets in mid-2008 through 2009, had a severe adverse effect on the real estate industry.[64] Plaintiffs, by contrast, assert that the compa-

Opus Corp., admitted that Opus Corp. was liable to plaintiffs for benefits under the 80/20 Plan. (Pls.' SGI, ¶ 27; Declaration of John Greer in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Greer Decl."), Docket No 71 (Sept. 14, 2011), ¶ 4 ("I had a conversation with Tim Becker ... who informed me that Opus Corporation had determined that [it was] in fact legally liable for the 80/20 plans. This conversation occurred while I was trying to obtain compensation for employees prior to actually having to file the Opus West lawsuit in Dallas, Texas").)

While defendants object that the testimony is hearsay, it could be a party admission, which is non-hearsay. See FED.R.EVID. 801(d)(2)(D) ("A statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship"). To show that the statement is admissible under Rule 801(d)(2)(D), however, plaintiffs must establish, by substantial evidence, (1) that there was an agency relationship between Becker and Opus Corp.; (2) that Becker's statements were made during the course of that relationship; and (3) that the statements concerned matters within the scope of Becker's agency. See, e.g., *Hilao v. Estate of Marcos*, 103 F.3d 767, 775 (9th Cir.1996) ("The existence of an agency relationship is a question for the judge under Rule 104(a) and must be proved by substantial evidence but not by a preponderance of the evidence"); see also *Gomez v. Rivera Rodriguez*, 344 F.3d 103, 116 (1st Cir. 2003); *Pappas v. Middle Earth Condominium Ass'n.*, 963 F.2d 534, 537 (2d Cir.1992). Plaintiffs proffer no evidence regarding any of these points. Their failure to lay a proper foundation regarding Becker's agency relationship with Opus Corp. makes Greer's testimony inadmissible. See *Breneman v. Kennecott Corp.*, 799 F.2d 470, 473 (9th Cir.1986) ("Rule 801(d)(2)(D) requires the proffering party to lay a foundation to show that an otherwise excludable statement relates to a matter within the scope of the agent's employment"). Defendants also object that the statement was made during the course of settlement discussions, rendering it inadmissible under Rule 408. See FED.R.EVID. 408(a) ("furnishing or offering or promising to furnish ... valuable consideration in compromising or attempting to compromise the claim" and "conduct or statements made in compromise negotiations regarding the claim" are not admissible to prove liability for the claim). Given that Greer's testimony must be excluded as hearsay, the court need not address this issue.

Plaintiffs also seek proffer the testimony of T. Roberts that Keith Bednarowski, president, CEO, and then-Board member of Opus Corp., told him on "numerous occasions" that Opus Corp. was obligated to pay his deferred compensation under "what is sometimes called the Presidents Deferred Compensation Plan ... otherwise titled "Opus Annual Incentive Plan for Operating Subsidiaries." (Pls.' SGI, ¶ 28; T. Roberts Decl., ¶ 3.) Although Bednarowski is a party to this litigation in his individual capacity, his statement is offered not to establish his personal liability, but that of Opus Corp. Consequently, plaintiffs must demonstrate by substantial evidence (1) that there was an agency relationship between Bednarowski and Opus Corp. on these "numerous occasions"; (2) that Becker's statements were made during the course of that relationship; and (3) that the statements concerned matters within the scope of Becker's agency. See *Hilao*, 103 F.3d at 775. Plaintiffs have failed to carry their burden on all counts, as T. Roberts's declaration contains nothing more than a bare assertion that Bednarowski made the admissions at unspecified times "throughout [T. Roberts's] employment." (T. Roberts Decl., ¶ 3.) As plaintiffs have failed to lay the proper foundation for admission of Roberts' hearsay statements, the court must exclude them.

64. Defs.' SUF, ¶¶ 48–49; Pls.' SGI, ¶¶ 48–49; T. Roberts's Responses (Set Two), No. 140; McFarland Depo. at 17:9–11, 53:14–25.

ny's failure was largely due to a series of transactions between Opus West and other Opus companies, pursuant to which those entities lent money to Opus West to create the appearance that it was complying with its loan covenants and debt obligations.[65]

T. Roberts stated on November 6, 2008, that "[n]o one would ever have predicted the current Sale market ...," and that "[h]opefully, the markets will open up in 2009."[66] By late December 2008, however, T. Roberts believed that Opus West was "doomed to fail," particularly because it had defaulted on a loan that he denominates "the Chino loan."[67] T. Roberts im-

mediately began planning to restructure Opus West's debt.[68]

On March 15, 2009, Opus West failed, for the first time, to pay T. Roberts and other employees the compensation they were due.[69] On July 6, 2009, approximately ten weeks later, it filed a Chapter 11 bankruptcy petition in the Northern District of Texas.[70] Phoenix Capital Partners was designated Chief Restructuring Officer for the company, and John Greer, one of the plaintiffs, was placed in charge of the restructuring effort.[71] Greer had previously served as the company's Executive Vice President.[72] Each plaintiff has filed

---

**65.** Pls.' SUF, ¶¶ 20–26; Hafif Decl., ¶ 14, Exh. 7 ("Pls.' Resp. to Special Interrogatories, Set Two"). The transactions detailed are as follows:

- On April 13, 2007, an entity plaintiffs denominate Opus Financial lent Opus West $7.5 million, which was booked as subordinated debt. The loan was repaid 77 days later.
- On April 30, 2007, Opus Corp. made a "Journal entry" loan to Opus West for approximately $7,428,000, although no money changed hands. This loan was also booked as subordinated debt, and was "paid back" 60 days later.
- On December 28, 2007, Opus Financial made a five-day loan to Opus West for $8 million, which was booked as subordinated debt.
- On March 20, 2008, through "OUS, TFC" (presumably Opus U.S. LLC), made a $12,249,000 loan at 33% interest to Opus West; this loan was outstanding for 103 days.
- On March 31, 2008, Opus Corp., through OUS, TFC made a $17,751,000 loan to Opus West, which was outstanding for one day.
- On April 11, 2008, Opus Financial lent Opus West $4,874,000 at 33% interest for 49 days, in a loan booked as subordinated debt.
- On September 30, 2008, Opus Corp., through OUS, TFC loaned Opus West $10,000,000, which was booked as subordinated debt.

As evidence, plaintiffs cite Exhibit 7 to Hafif's declaration, which is a copy of their responses to defendants' special interrogatories. The

document is nearly 60 pages long, and plaintiffs' proposed statement of genuine issues provides no pin cites or page references for the document. The transactions in question are discussed in Response No. 12, however, found on pages 36–37. The response appears to have been lifted wholesale from the complaint, in answer to an interrogatory asking plaintiffs to describe, in detail, the transactions they allege to be fraudulent. No other evidence is offered to support plaintiffs' contention that these transactions occurred. The cited "evidence" is merely a recitation of plaintiffs' allegations in the case.

**66.** Defs.' SUF, ¶ 50; Pls.' SGI, ¶ 50; T.W. Decl., Exh. N (November 6, 2008 email from T. Roberts to Bednarowski).

**67.** Defs.' SUF, ¶ 52; Pls.' SGI, ¶ 52; T.W. Decl., Exh. F ("T. Roberts Depo.") at 80:13–81:8.

**68.** Defs.' SUF, ¶ 53; Pls.' SGI, ¶ 53; T. Roberts Depo. at 269:18–270:2.

**69.** Defs.' SUF, ¶ 57; Pls.' SGI, ¶ 57; T. Roberts Depo. at 43:18–21.

**70.** Defs.' SUF, ¶ 61; Pls.' SGI, ¶ 61; W.T. Decl., Exh. T (Bankruptcy Deposition of John Greer) at 14:8–11, 15:15–16:2.

**71.** Defs.' SUF, ¶¶ 62–63; Pls.' SGI, ¶ 62–63.

**72.** Defs.' SUF, ¶ 62; Pls.' SGI, ¶ 62.

an unsecured creditor claim in the bankruptcy proceeding.[73] On September 18, 2009, Greer sent a letter to defendants Mark Rauenhorst and Keith Bednarowski, as well as to Opus Corp.'s founder Gerald Rauenhorst, noting the large amount of employee deferred compensation that was

73. Defs.' SUF, ¶ 83; Pls.' SGI, ¶ 83; Defs.' RJN, Exhs. DD–SS (bankruptcy court orders describing plaintiffs' various claims).

74. Defs.' SUF, ¶ 65; Pls.' SGI, ¶ 65. Although this statement is undisputed, defendants proffer a range of evidence describing plaintiffs' plans to file a lawsuit against them, allegedly to recover their deferred compensation and other benefits. (See, e.g., Defs.' SUF, ¶¶ 54–56, 58–60, 64, 66–69, 73–76; W.T. Decl., Exhs. P–Q (emails from T. Roberts asking for a "good employment lawyer" and stating that "Plan B is a law suit against Opus, Trust, and beneficiaries"); W.T. Decl., Exh. R (email exchange between Jefferson Hill and Tom Schaal, Jr. stating: "I want my money and I want the fuck out. I feel we need to resign Monday, let 72 hours pass, and when we don't get our money, IMMEDIATELY file a brutal lawsuit and beat the 11 filing. . . . They will wish they never fucked with us," and discussing meeting with a labor attorney); W.T. Decl., Exh. J (email from John Greer to Thomas Roberts requesting that latter "[a]sk your lawyer contact what he thinks about the Opus West employees suing Corp and the Trust for fraudulent conveyance to get our deferred dollars. I am going to check with Greenberg to see if we have the ability to use the bankruptcy process to fund litigation as unsecured creditors. We have a $5 M war chest to use, if the idea has any merit. Think about the publicity in Minneapolis (and elsewhere) if the employees were to file suit. Might at least make them squirm some").)

Defendants offer this evidence to demonstrate that plaintiffs sought by filing this action to recover funds that Opus West allegedly transferred fraudulently to defendants; they assert this shows that the bankruptcy court should exercise jurisdiction over the claims. Plaintiffs object to the evidence on relevance grounds. For reasons the court explains *infra*, plaintiffs' subjective motivation for filing

unsecured and demanding that defendants "recognize the inequities of this situation and do something about it." [74]

On January 25, 2010, Opus West filed an adversary proceeding against defendants in the Northern District of Texas.[75] As noted, plaintiffs filed this action

suit is not relevant in assessing whether their claims are barred by the Chapter 11 plan and bankruptcy court injunction, and thus are properly asserted by the bankruptcy estate. "Relevant evidence" is "evidence having any tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED.R.EVID. 401. As none of the evidence defendants proffer is relevant to an issue raised by the motion, the court sustains plaintiffs' objection.

Even if some of the evidence had marginal probative value, that value would be substantially outweighed by its prejudicial effect, given the many inflammatory statements made by plaintiffs in the communications. See FED. R.EVID. 403 (evidence whose probative value "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence" is properly excluded).

75. Defs.' SUF, ¶ 77; Pls.' SGI, ¶ 77. Defendants proffer no evidence of this fact; they merely state that "[t]he adversary proceeding was filed in the bankruptcy pending in the Northern District of Texas," and cite what is presumably the case number of that action. (*Id.*) Although a court can take judicial notice of proceedings in other courts, as they are matters of public record, defendants proffer no evidence that there was an adversary proceeding. Attached as Exhibit 2 to the Hafif declaration, however, is a copy of plaintiffs' opposition to defendants' motion to enforce the plan of liquidation and enjoin the California lawsuit filed in the bankruptcy court. (Hafif Decl., Exh. 2.) "Exhibit B" to the motion to enforce is a copy of the adversary proceeding complaint, which is signed and dated January 25, 2010. (*Id.* at 33.) The court therefore takes judicial notice that an

on June 29, 2010.[76] Defendants subsequently moved in bankruptcy court to enjoin this litigation, claiming that "potential causes of action belonging to the estate against movants have been preserved in both the [bankruptcy plan] and the order confirming the plan."[77] The bankruptcy court enjoined plaintiffs from proceeding with a number of claims asserted in the original complaint, stating that they were "either expressly or, at their heart, fraudulent transfer claims so as to be covered by the plan and confirmation order."[78] It held, as a consequence, that such "claims [were] property of the estate and [had to] be pursued for the benefit of all creditors."[79] The court denied defendants' request to enjoin plaintiffs from prosecuting "Counts 5, 6, 7, 9, and 11" in the original complaint, stating that "[t]he plan and the confirmation order [did] not affect [plaintiffs'] right[] to bring such claims."[80] It held additionally that Count 11, the Racketeer Influenced and Corrupt Organizations

Act ("RICO") claim, was not property of the estate.[81]

Following entry of the bankruptcy court's order, plaintiffs filed an *ex parte* application for leave to file a first amended complaint, which the court granted.[82] The first amended complaint alleges claims for intentional interference with contract, inducing breach of contract, violation of California's Unfair Competition Law ("UCL"), California Business & Professions Code § 17200 et seq., RICO violations, unjust enrichment, ERISA violations, and declaratory relief.[83]

## II. DISCUSSION

### A. Legal Standard Governing Motions for Summary Judgment

A motion for summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affida-

adversary proceeding was filed in Opus West's bankruptcy.

76. Defs.' SUF, ¶ 80; Pls.' SGI, ¶ 80; Complaint.

77. Defs.' RJN, Exh. UU ("July 2010 Bankruptcy Court Injunction") at 1–2.

78. *Id.* at 2.

79. *Id.*

80. *Id.*

81. *Id.*

82. *Ex Parte* Application to Shorten Time for Notice of Motion and Motion for Leave to File First Amended Complaint, Docket No. 49 (May 31, 2011); Order Granting Plaintiffs' Request to File an Amended Complaint, Extending Case Management Schedule, Docket No. 57 (July 5, 2011).

83. Defs.' SUF, ¶ 88; Pls.' SGI, ¶ 88; FAC. Once again, defendants proffer evidence regarding plaintiffs' motivation for filing suit. Much of the evidence is deposition testimony.

(See Defs.' SUF, ¶¶ 89–96.) For example, plaintiff Janssen testified:

"Q: As I understand your claim in this lawsuit, it is that there was or at least one of the claims is that there was money that went from Opus West Corporation to Opus Corporation in the form of dividends that should not have, correct?

A: That is correct, and/or perhaps some of the money should have come back."

(W.T. Decl., Exh. X ("Janssen Depo") at 214:9–15.)

Daniel Haug testified that the "stolen" money was "[t]he profits that were earned by the development activities and were upstreamed by—you know, upstreamed to the—to the trusts." (W.T. Decl., Exh. Y ("Haug Depo.") at 168:3–7.)

As noted, plaintiffs' subjective reasons for filing this action are not relevant in assessing whether the claims are property of the bankruptcy estate. Nor is their motivation in suing relevant to any *other* legal question raised by this motion. Consequently, the court declines to consider this evidence to the extent defendants proffer it to show plaintiffs' motivation in filing suit.

vits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV.PROC. 56(c). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. See *id.* If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Fed. R. Civ.Proc. 56(e).

In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most favorable to the nonmoving party. See *T.W. Electrical Service, Inc. v. Pacific Electric Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987). The evidence presented by the parties must be admissible. FED.R.CIV.PROC. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. See *Falls Riverway Realty, Inc. v. Niagara Falls*, 754 F.2d 49, 56 (2d Cir.1985); *Thornhill Pub.*

*Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979).

### B. Whether Plaintiff's State Law Claims are the Property of the Bankruptcy Estate

### 1. Whether the Court Has Power to Determine If Plaintiffs' Claims Are Property of the Bankruptcy Estate

 The "[c]ommencement of a bankruptcy case creates an estate comprised of 'all legal and equitable interests' of the debtor." *In re Moore*, 110 B.R. 924, 926 (Bankr.C.D.Cal.1990) (quoting 11 U.S.C. § 541(a)(1)); see 11 U.S.C. § 541 (describing the property that belongs to the bankrupt estate in a Chapter 11 proceeding). In addition to tangible assets, the estate is comprised of intangible legal interests such as "causes of action" belonging to the debtor. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n. 9, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983); see *Sierra Switchboard Co. v. Westinghouse Elec. Corp.*, 789 F.2d 705, 707 (9th Cir. 1986) ("The scope of section 541 is broad, and includes causes of action").

 When a trustee is appointed by the bankruptcy court, he or she becomes the representative of the estate, and in that capacity, can sue and be sued on the estate's behalf. 11 U.S.C. § 323. Stated differently, " 'the trustee stands in the shoes of the bankrupt corporation and has standing to bring any suit that the bankrupt corporation could have instituted had it not petitioned for bankruptcy.' " *Smith v. Arthur Andersen LLP*, 421 F.3d 989, 1002 (9th Cir.2005) (quoting *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir.1991) (internal citations omitted)). The trustee has exclusive standing to assert the debtor's causes of action. See *In re Marketing Services, LLC*, 309 B.R. 783, 788 (Bankr.S.D.Cal. 2004) ("[I]f the debtor could have raised a

claim at the commencement of the bankruptcy case, the claim becomes the exclusive property of the bankruptcy estate and cannot be asserted by a creditor" (citations omitted)).

The trustee's standing is not limitless, however. " 'It is well settled that a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself.' " *Id.* (quoting *Shearson Lehman*, 944 F.2d at 118 (internal citation omitted), and citing *Steinberg v. Buczynski*, 40 F.3d 890, 893 (7th Cir.1994) ("[T]he trustee is confined to enforcing entitlements of the corporation. He has no right to enforce entitlements of a creditor")). See also *Williams v. Cal. 1st Bank*, 859 F.2d 664, 666 (9th Cir.1988) (explaining that in *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972), the Supreme Court held that a trustee has no standing to assert claims of misconduct against a third party). In drawing "the line between 'claims of the debtor,' which a trustee has statutory authority to assert, and 'claims of creditors,' which *Caplin* bars the trustee from pursuing, ... the focus of the inquiry is on whether the Trustee is seeking to redress injuries to the debtor itself caused by the defendants' alleged conduct." *Smith*, 421 F.3d at 1002 (citing *Scholes v. Lehmann*, 56 F.3d 750, 753 (7th Cir.1995)).

Here, the bankruptcy court in the Northern District of Texas determined that certain of the state law claims plaintiffs earlier pled belonged to the bankruptcy estate; its order did not extend to plaintiffs' current state law claims. Plaintiffs cite *Celotex Corp. v. Edwards*, 514 U.S. 300, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995), and *Gruntz v. County of Los Angeles*, 202 F.3d 1074, 1082 (9th Cir.2000) (en banc) for the proposition that defen-

dants' argument here is an improper "collateral attack" on the bankruptcy court's prior order. *Celotex* and *Gruntz* are distinguishable, however. In *Celotex*, the bankruptcy court had previously issued an injunction covering certain claims that creditors later asserted against the debtor in a separate district court action. See *Celotex*, 514 U.S. at 303, 115 S.Ct. 1493 (observing that the plaintiff creditors sought to execute on a supersedeas bond that the debtor had posted pending appeal following affirmance of the judgment below despite a bankruptcy court order that prohibited creditors from proceeding against sureties). The Court held that plaintiffs could not challenge the validity or scope of the bankruptcy court's injunction in the district court litigation, and that, "[i]f dissatisfied with the Bankruptcy Court's ultimate decision," plaintiffs' only recourse was seek reconsideration in the bankruptcy court, and/or appeal the order in the district and circuit court. *Id.* at 313, 115 S.Ct. 1493. *Gruntz* addressed whether a judgment debtor could seek to enjoin a state criminal prosecution against him as violating an automatic stay entered by a bankruptcy court. 202 F.3d at 1078. The Ninth Circuit, sitting *en banc*, held that "[a]ny state court modification of the automatic stay would constitute an unauthorized infringement upon the bankruptcy court's jurisdiction to enforce the stay," and that the judgment of a state court regarding the scope of a bankruptcy stay would have no preclusive effect on any later determination by the bankruptcy court. *Id.* at 1082, 1084.

The court here is faced with a different situation, in which defendant asserts as a defense that plaintiffs' claims *are* covered by the bankruptcy court's injunction, and are thus property of the bankruptcy estate. In *Lockyer v. Mirant Corp.*, 398 F.3d 1098 (9th Cir.2005), the Ninth Circuit

addressed such a situation and concluded that *Celotex* and *Gruntz* did not preclude the district court from addressing such an argument. It stated:

"Neither [*Celotex* nor *Gruntz*] casts doubt on a district court's ability to decide for itself whether proceedings pending before it are subject to an automatic stay. *Celotex* tells us that a district court has no authority to modify or to disregard a § 105 injunction. Only the bankruptcy court that issued the injunction has the authority to modify the injunction, and until the injunction is modified the district court is bound by it. *Gruntz* tells us that a state court has the authority to decide whether its proceeding is within the scope of the automatic stay, but the state court's holding is not entitled to preclusive effect in the bankruptcy court.

There is no reason why a federal court should have less power than a state court to decide whether its proceeding comes within the scope of the automatic stay.... We therefore hold, in accordance with established law, that a district court has jurisdiction to decide whether the automatic stay applies to a proceeding pending before it, over which it would otherwise have jurisdiction." *Id.* at 1106–07.

Consequently, the court concludes that it has power to decide whether plaintiffs lack standing to assert their state law claims because the claims are property of the bankruptcy estate.

## 2. Whether Collateral Estoppel Bars Defendants from Asserting that Some of Plaintiffs' State Law Claims Are Property of the Bankruptcy Estate

Although the court concludes as a general matter that it can determine whether plaintiffs' claims are property of the bank-

ruptcy estate and/or within the scope of the bankruptcy court's injunction, there is another issue that must be addressed. The bankruptcy court previously found that neither the Chapter 11 plan nor the injunction it had entered precluded plaintiffs from proceeding on certain state law claims alleged in the original complaint. As a consequence, the court must examine whether res judicata or collateral estoppel prevents defendants from asserting that plaintiffs lack standing to prosecute their state law claims since the claims are the exclusive property of the bankruptcy estate.

"Claim preclusion prevents parties from relitigating the same claim or cause of action, which includes 'litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding.'" *Fischel v. Equitable Life Assur. Soc'y of the United States*, 307 F.3d 997, 1005 n. 5 (9th Cir.2002) (quoting *Robi v. Five Platters, Inc.*, 838 F.2d 318, 321–22 (9th Cir.1988)). Under the doctrine of issue preclusion, "an issue of fact or law, actually litigated and resolved by a valid final judgment, binds the parties in a subsequent action, whether on the same or a different claim." *Baker by Thomas v. General Motors Corp.*, 522 U.S. 222, 233 n. 5, 118 S.Ct. 657, 139 L.Ed.2d 580 (1998); *Hydranautics v. FilmTec Corp.*, 204 F.3d 880, 887 (9th Cir.2000) (noting that under doctrine of issue preclusion, or collateral estoppel, "an issue of fact or law, actually litigated and resolved by a valid final judgment, binds the parties in a subsequent action, whether on the same or a different claim"). The collateral estoppel that would apply here would be "offensive," in the sense that "plaintiff[s] seek[ ] to foreclose the defendant[s] from litigating an issue the defendant[s] ... previously liti-

gated unsuccessfully in a[ ] [prior] action...."

▇▇▇] It is appropriate to apply "[c]ollateral estoppel ... when the following elements are met: (1) there was a full and fair opportunity to litigate the issue in the previous action; (2) the issue was actually litigated in that action; (3) the issue was lost as a result of a final judgment in that action; and (4) the person against whom collateral estoppel is asserted was a party or in privity with a party in the previous action." *In re Palmer,* 207 F.3d 566, 568 (9th Cir.2000); *Pena v. Gardner,* 976 F.2d 469, 472 (9th Cir.1992) (identifying the four elements of offensive collateral estoppel).

▇▇▇] In *Travelers Indemn. Co. v. Bailey,* 557 U.S. 137, 129 S.Ct. 2195, 174 L.Ed.2d 99 (2009), the Supreme Court examined the applicability of collateral estoppel in the context of a bankruptcy court order that had not been challenged on direct appeal. It reversed a Second Circuit decision that had revisited and invalidated part of a prior bankruptcy court order on the grounds that the bankruptcy court had exceeded its jurisdiction in issuing the order. *Id.* at 2205. The Second Circuit reached this result despite the fact that the order in question had issued more than two decades earlier and had not been appealed. *Id.* at 2205. The Court held that "[s]o long as respondents or those in privity with them were parties to the ... bankruptcy proceeding, and were given a fair chance to challenge the Bankruptcy Court's subject-matter jurisdiction, they cannot challenge it now by resisting enforcement of the 1986 Orders." *Id.* at 2206.[84] It observed that permitting courts to "entertain this sort of collateral attack [could not] be squared with res judicata and the practical necessity served by that rule.... Almost a quarter-century after the 1986 Orders were entered, the time to prune them is over." *Id.*[85]

Of the four prerequisites to application of collateral estoppel, the fourth (identity and/or privity among the parties) is not in dispute here; the court's analysis thus focuses on the remaining three elements. The first two address concern whether the parties had a full and fair opportunity to litigate the issue now being raised in the earlier action and whether the issue was actually litigated.

▇▇▇] It is clear that at the least as respects some of plaintiffs' claims, a simi-

**84.** The *Bailey* Court noted that the bar on collateral attack on subject matter jurisdiction "is not absolute," citing three "exceptional circumstances" in which a collateral attack on subject matter jurisdiction is permitted. *Bailey,* 129 S.Ct. at 2206 n. 6 (citing RESTATEMENT (SECOND) OF JUDGMENTS § 12, p. 115 (1980)). Those circumstances are:

"(1) The subject matter of the action was so plainly beyond the court's jurisdiction that its entertaining the action was a manifest abuse of authority; or
"(2) Allowing the judgment to stand would substantially infringe the authority of another tribunal or agency of government; or
"(3) The judgment was rendered by a court lacking capability to make an adequately informed determination of a question concerning its own jurisdiction and as a matter of procedural fairness the party seeking to avoid the judgment should have opportunity belatedly to attack the court's subject matter jurisdiction."
The *Bailey* Court did not explicitly adopt any of these exceptions, but implied that it might under appropriate circumstances. *Id.*

**85.** The *Bailey* Court's holding is fatal to defendants' argument that despite issuance of the bankruptcy court order, the court has "concurrent and independent jurisdiction to decide whether plaintiffs' claims are barred by the bankruptcy plan injunction." (Reply at 3–4.) While, as noted, the court has power to determine whether plaintiffs' claims are barred by the injunction, collateral estoppel nonetheless applies, such that, if the issue was already litigated and decided in the bankruptcy proceeding, it cannot be relitigated now.

lar issue was litigated in the bankruptcy court more than a year ago. On June 29, 2010, plaintiffs initiated this action by filing a complaint that alleged eleven causes of action, including, *inter alia,* fraudulent transfer, conspiracy, intentional and negligent interference with contract, violation of the UCL, conversion, and RICO violations.[86] On July 12, 2010, defendants filed a motion in bankruptcy court to enforce the plan of liquidation and enjoin plaintiffs from pursuing this action; they argued that plaintiffs' complaint was "based upon the same alleged fraudulent transfer claims that [were] being pursued by the Surviving Officer before [the bankruptcy court.]"[87] Defendants asserted that all of plaintiffs' claims were predicated on alleged fraudulent transfers between Opus West, Opus Corp. and other defendant entities, and that as a result, "none of the Opus West Employees' claims [were] causes of action ... independent [of] the Surviving Officer's causes of action before th[e] [Bankruptcy] Court."[88] Plaintiffs opposed the motion on July 20, 2010, noting that, although some of their causes of action "relate[d] to" the fraudulent transfers, other claims were "not derivative of the fraudulent transfer claims but [stood] on their own."[89] Plaintiffs also contended that employee pension funds were not property of the bankruptcy estate, since they "belong[ed] to [plaintiffs]," and that under ERISA, Opus West "held the pension funds in trust for the benefit of the Hill Plaintiffs ..."[90] Consequently, they asserted, "Opus West would be entitled [only] to any *residual* assets of the pension plan upon termination and after allocation of plan assets among the employee participants and beneficiaries."[91] Defendants filed a reply on July 21, 2010.[92] In addition to countering plaintiffs' other arguments, they asserted that plaintiffs mischaracterized the deferred compensation plans in question, overlooking the fact that they were unfunded and that they gave plaintiffs unsecured creditor status only.[93]

On July 26, 2010, Bankruptcy Judge Harlin Hale issued a brief three-page order granting the motion in part and denying it in part.[94] Judge Hale enjoined plaintiffs from prosecuting "Counts 1, 2, 3, 4, 8, and 10," i.e., plaintiffs' fraudulent transfer, conspiracy and conversion claims.[95] As respects the remaining five counts—which alleged intentional and negligent interference with contract, violation of the UCL, intentional interference with prospective economic advantage, and RICO—violations the court held that

---

86. Complaint at 1–2. Plaintiffs pled the following claims: (1) Fraudulent transfer under California Civil Code § 3439.07(a); (2) fraudulent transfer under A.R.S. § 44–1004, Arizona's fraudulent transfer statute; (3) common law fraudulent transfer; (4) conspiracy; (5) intentional interference with contract; (6) negligent interference with contract; (7) violation of the UCL; (8) conversion; (9) intentional interference with prospective economic advantage; (10) set aside of fraudulent transfer under Uniform Fraudulent Transfer Act, Minn.Stat. § 513.44; and (11) RICO violations. (*Id.*)

87. Hafif Decl., Exh. A ("Opus Defendants' Motion to Enforce the Plan of Liquidation").

88. *Id.* at 6.

89. Hafif Decl., Exh. B ("Plaintiffs' Opposition to Opus Defendants' Motion") at 6.

90. *Id.*

91. *Id.* (emphasis original).

92. Hafif Decl., Exh. 8 ("Reply to Opus West Employees' Opposition to Motion to Enforce").

93. *Id.* at 2–6.

94. Bankruptcy Judge Order at 1.

95. *Id.* at 2.

"[t]he plan and the confirmation order do not affect Respondents' rights to bring such claims."[96] The court offered little explanation regarding the distinction between the enjoined and non-enjoined counts, noting only that the former were "either expressly, or, at their heart, fraudulent transfer claims so as to be covered by the plan and confirmation order."[97]

Plaintiffs' first amended complaint, which is now the operative pleading, pleads claims for (1) intentional interference with contract; (2) inducing breach of contract; (3) violation of the UCL; (4) RICO violations; (5) unjust enrichment; (6) ERISA violations; (7) and declaratory relief.[98] Only the intentional interference with contract, inducing breach of contract, and RICO claims were pled in both the initial and first amended complaint.[99] The amended complaint also alleged state law claims for unjust enrichment and declaratory relief that were not included in the original complaint; because the bankruptcy court did not consider those claims, the parties never had the opportunity to litigate whether they were covered by the Chapter 11 plan and the injunction. Consequently, defendants are not collaterally estopped from asserting that those claims are precluded by the plan and injunction.

The claims that remain are plaintiffs' intentional interference with contract, inducing breach of contract, and UCL claims. Defendants' attack on those claims raises arguments similar to those raised in the bankruptcy court, i.e., defendants contend that plaintiffs' alleged injuries are not "significantly different" than those experienced by other unsecured creditors, and that their interference with contract claim is a "fraudulent conveyance claim common to all Opus West creditors."[100] It seems clear that these issues were litigated and actually decided by the bankruptcy court when it issued its order.

Defendants contend that when Judge Hale considered defendants' motion, "he did not have the benefit of the record now before the Court."[101] They assert that because only the "face of the initial Complaint" was available to Judge Hale, the parties did not "fully litigate" whether the claims were precluded by the Chapter 11 plan and injunction in bankruptcy court.[102] The key distinctions defendants identify are (1) the first amended complaint, which was filed after the entry of the bankruptcy court's order and which is substantively different than the original complaint, and (2) plaintiffs' depositions and other evidence that allegedly establishes plaintiffs seek to recover funds that were transferred by Opus West to some of the defendant entities, demonstrating that plaintiffs' injuries are no different than those of other unsecured creditors.

■■■ The court addresses the second category of evidence first. Much of defen-

96. *Id.*

97. *Id.*

98. FAC at 1–2.

99. In a prior order, the court dismissed plaintiffs' RICO claim and found that their state law causes of action were preempted insofar as they sought benefits under ERISA-covered deferred compensation plans. (Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, Docket No. 85 (Nov. 14, 2011).) The court therefore addresses plaintiffs' state law claims only insofar as they seek to recover benefits under non-ERISA benefits plans.

100. *Motion at 16–17; Reply at 6 (arguing that plaintiffs lack standing "because their injuries are merely derivative of the alleged harm to Opus West").*

101. Reply at 3.

102. *Id.*

dants' evidence is correspondence among the parties, deposition excerpts containing statements by plaintiffs about their reasons for filing this action, and proof external to the pleadings. Leaving aside plaintiffs' various objections to this evidence, courts assessing whether claims asserted by third parties belong to the bankruptcy estate of a debtor typically examine the allegations of the third party complaint without resort to extrinsic evidence. See *Smith v. Arthur Andersen LLP*, 421 F.3d 989, 1002 (9th Cir.2005) (in a case reviewing whether the trial court properly approved a bankruptcy trustee's settlement of claims, court looked to the allegations of the trustee's complaint to determine whether he had standing to pursue claims against the defendants); *In re Henson*, Bankruptcy No. 98–51326–ASW, Adversary No. 03–5131, 2006 WL 3861370, *4 (Bankr.N.D.Cal. Apr. 21, 2006) noting, in the context of a summary judgment motion, that "[r]esolution of the standing question raised by Lucas and the Trustee requires an analysis of *the cause of action stated in the Complaint and applicable sections of the Bankruptcy Code*" (emphasis added); *In re AgriBioTech, Inc.*, 319 B.R. 216, 222 (D.Nev.2004) (determining, on summary judgment, whether bankruptcy trustee had standing to assert claims by examining the claims "[a]s pled in the Complaint and under the applicable law"); see also *Securities Investor Protection Corp. v. Bernard L. Madoff Inv. Securities LLC*, 443 B.R. 295, 314 (Bankr.S.D.N.Y. 2011) (construing the allegations in a complaint to determine whether the claims asserted were subject to automatic stay).

Even if the court construed plaintiffs' testimony and other evidence of their statements as party admissions regarding their intentions in filing this suit—an issue it does not reach—this would not alter the analysis. Whatever plaintiffs' motivations for filing suit, or their intentions concerning the litigation, their causes of action and prayer for relief are alleged in the pleadings; plaintiffs can only recover on causes of action that have been pled. Cf. *Gruntz*, 202 F.3d at 1087 (holding that a state criminal prosecution of the debtor was exempt from the automatic stay, and could proceed even "if the prosecution is motivated by the complaining witness's desire to collect a debt"). Consequently, the court deems irrelevant the "new" evidence defendants proffer concerning plaintiffs' motives in filing suit, and their desire to recover funds transferred by Opus West to Opus Corp., the absence of which defendants argue deprived them of a full and fair opportunity to litigate whether plaintiffs' claims are property of the bankruptcy estate or within the ambit of the bankruptcy court injunction.[103] See *Steel Hill Development, Inc. v. Town of Sanbornton*, 392 F.Supp. 1134, 1139 (D.N.H.1974) ("[I]t is clear that collateral estoppel cannot be avoided by discovery and introduction of new evidence bearing on a fact in issue in the absence of a subsequent event which creates a new legal situation," citing *Southern Pacific R. Co. v. United States*, 168 U.S. 1, 18 S.Ct. 18, 42 L.Ed. 355 (1897)).

What remains, therefore, is whether the amendments plaintiffs have made to claims pled in the original complaint have substantially altered the nature of the claims such that the parties lacked a "full and fair opportunity" to litigate whether they are property of the bankruptcy estate and/or within the ambit of the bankruptcy court injunction in the bankruptcy court pro-

---

**103.** Some of the evidence defendants submit in support of their argument may be relevant to other legal or factual issues raised by this motion. The court will rely on the evidence insofar as it bears on those other issues.

ceeding. The claims at issue are plaintiffs' intentional interference with contract, inducing breach of contract, and UCL claims.[104]

On the face of it, there have been very few changes in the claims as originally pled. The factual basis of the claims is largely the same—both complaints allege that Opus West's fraudulent transfers to defendants led to its financial collapse and bankruptcy. The original complaint alleged claims for intentional and negligent interference with contract. The parties addressed those claims in the bankruptcy court proceedings and had an opportunity to litigate fully whether they were property of the bankruptcy estate or subject to the bankruptcy court's injunction.

■■■ The key difference between the interference claims alleged in the original complaint and the interference and inducing breach of contract claims alleged in the amended complaint lies in the alterations plaintiffs have made to the original claims and in amendments to their prayer for relief. Plaintiffs now plead claims for intentional interference with contract and inducing breach of contract; the latter claim replaces the original negligent interference with contract claim. This legal basis for the inducing breach of contract claim is different than that on which the

negligent interference claim rested. In addition, in their original complaint, plaintiffs' prayer for relief on their intentional and negligent interference claims sought general and special damages, punitive damages, and an order to show cause "why defendants should not be enjoined." [105] No transfer of property or funds from defendants to plaintiffs was mentioned, and no recovery of the deferred compensation benefits that plaintiffs are allegedly owed was sought on these claims.

The relief the first amended complaint seeks on plaintiffs' intentional interference with contract and inducing breach of contract claims is markedly different, however. Plaintiffs request, *inter alia,* "[t]hat the transfer[s] from Opus West to [defendants] be set aside and declared void as to the Plaintiffs herein to the extent necessary to satisfy Plaintiffs' claims," "[t]hat the property in [defendants' hands] be attached," "[t]hat [defendants] be restrained from disposing of the property," and "[t]hat an order be made declaring that [defendants] hold the property in trust for plaintiffs." [106] This language parallels, and in many respects is virtually identical to, the relief plaintiffs sought in the original complaint on their fraudulent conveyance claims.[107] While the prayer for relief also

---

**104.** Because "inducing breach of contract" is an element of "intentional interference with contract," defendants contend that the interference and inducing claims should be deemed to be the same. California, however, appears to consider them separate causes of action. See *625 3rd St. Associates, L.P. v. Alliant Credit Union,* 633 F.Supp.2d 1040, 1048 (N.D.Cal.2009) (stating that the "elements for inducement to breach contract are similar to those for interference with contractual relations," but analyzing the causes of action as separate claims). The court therefore treats them separately.

**105.** Complaint at 30.

**106.** FAC at 35–36.

**107.** *Complaint at 28* (seeking, on the fraudulent conveyance claims, an order directing that "[t]he transfer from Opus West to [defendants] be set aside and declared void as to the plaintiffs herein to the extent necessary to satisfy plaintiffs' claim," "[t]hat the property in the hands of [defendants] be attached," "[t]hat [defendants] be restrained from disposing of the property," and "[t]hat a temporary restraining order be granted plaintiffs enjoining and restraining [defendants] from selling, transferred, conveying, or otherwise disposing of any of the property transferred"); see also *id.* at 29 (seeking similar relief on the fraudulent transfer claim under Arizona law).

seeks general and punitive damages,[108] the relief sought is focused on recovery of monies allegedly transferred to defendants by Opus West.[109]

The first amended complaint is not the pleading that the parties addressed when they were litigated the motion for injunctive relief before the bankruptcy court; it was thus not the pleading that Judge Hale considered when ruling on the motion. A comparison of the original and first amended complaints in this action reveals that once plaintiffs were barred from asserting fraudulent transfer claims in this litigation, they recharacterized those claims as claims for intentional interference with contract and inducing breach of contract, and sought the *exact same relief* that Judge Hale's order precluded them from seeking on claims that were "at heart" fraudulent transfer claims.[110] This substantive change in the interference and inducing breach claims most probably would have been dispositive, given that the bankruptcy court enjoined plaintiffs' fraudulent transfer, conspiracy, and conversion claims, the latter two of which also sought general and punitive damages in addition to transfer of the property plaintiffs were allegedly owed.

Whether claims are subject to the plan and the injunction is determined by a functional test; it is not controlled by the label a party appends to a particular cause of action. See *Madoff*, 443 B.R. at 314 ("To the extent that certain causes of action set forth by the Third Party Plaintiffs in their complaints differ in name from those alleged in the Trustee's Madoff Complaint, those distinctions are irrelevant. Whether sounding in bankruptcy, state law or common law, and whether purporting to recover fraudulent transfers or tort damages, the Third Party Actions seek to recover potential estate assets to redress harms common to all victims of Madoff's massive Ponzi scheme that, consistent with the purposes of the automatic stay, belong exclusively to the Trustee"). Given the significant, substantive differences between the original and amended complaints, the court concludes that the parties did not have an opportunity to "fully and fairly litigate" whether such claims are precluded by the Chapter 11 plan and the bankruptcy court injunction. Consequently, defendants are not collaterally estopped from raising such an argument now.[111] See *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1357 (9th Cir.1985) (en banc) ("Similarity between issues does not suffice; collateral estoppel is applied only when the issues

108. FAC at 35.

109. The court acknowledges that this reasoning is not as applicable to plaintiffs' UCL claim, since the relief sought in the original complaint on that claim—i.e., restitution, disgorgement, an injunction, and the appointment of a receiver—is largely similar to that requested on the UCL claim in the first amended complaint. The first amended complaint also seeks imposition of a constructive trust and an accounting as relief on the UCL claim, however; these requests mirror the relief sought on the intentional interference and inducing breach of contract claims. (FAC at 35–36.) Despite this fact, the relative similarity between the UCL claim in the original complaint and that in the first amended complaint may well distinguish it from plaintiffs' intentional interference and inducing breach of contract claims, such that defendants are estopped from asserting that it is property of the bankruptcy estate and/or within the scope of the bankruptcy court's injunction. As the court discusses below, however, plaintiffs' UCL claim fails for a different and independent reason.

110. Bankruptcy Court Order at 2.

111. Given the court's conclusion, it need not address whether the issue defendants seek to raise was "lost as a result of a final judgment in that action." *Palmer*, 207 F.3d at 568.

are identical"); cf. *United States v. Bhatia*, No. CR 05–0334 SBA, 2007 WL 2554402, *7 (N.D.Cal. Sept. 4, 2007) (noting that when applicable statutes have different elements, "the issues in the two cases are not sufficiently similar to satisfy the first prong of the collateral estoppel test").

### 3. Whether Plaintiffs' State Law Claims for Non–ERISA Benefits are Property of the Bankruptcy Estate

As noted, "[a]lthough the line between 'claims of the debtor,' which a trustee has statutory authority to assert, and 'claims of creditors' ... is not always clear, the focus of the inquiry is on whether the Trustee is seeking to redress injuries to the debtor itself caused by the defendants' alleged conduct." *Arthur Andersen*, 421 F.3d at 1002.

 All of plaintiffs' state law causes of action seek payment of monies they were allegedly due under their benefits and deferred compensation plans. The claims pled are intentional interference with contract; inducing breach of contract; violation of the UCL; unjust enrichment; and declaratory relief.[112] The parties do

---

112. The court did not discuss the unjust enrichment claim in its analysis of the collateral estoppel effect of the bankruptcy court's order because that claim was not pled in the original complaint. The claim is largely similar, however, to the intentional interference with contract, inducing breach of contract, and UCL claims in that it alleges that defendants "[took] money from Opus West and forc[ed] the company to file bankruptcy," causing plaintiffs to "[lose] their retirement savings and chattel." (FAC, ¶¶ 108–09.) Plaintiffs seek restitution, the imposition of a constructive trust, and an accounting, as well as general and punitive damages, on the unjust enrichment claim. (FAC at 37–38.) Like the other claims, therefore, the unjust enrichment claim asserts that defendants stole the assets of Opus West.

The declaratory relief claim seeks a "declaration that *Defendants Opus and Opus LLC* are the responsible party for payment of the deferred compensation and pension plan money from the contracts for only certain plans." (FAC at 38.) This mirrors the relief plaintiffs seek on their ERISA claim; the plans referenced in the declaratory relief claim are described as "valid and enforceable contracts with Defendants for deferred compensation plans and pension funds." (*Id.*, ¶ 124.) To the extent that the declaratory relief claim addresses ERISA plans, the court has found that it is preempted and must be dismissed. To the extent it is based on non-ERISA plans, the declaratory relief claim is somewhat different than the other state law claims, in that plaintiffs contend certain defendants were directly obligated to make payments to them under the non-ERISA plans.

Thus, the claim does not necessarily require that plaintiffs show they had an ownership interest in particular assets of Opus West. Plaintiffs, however, have adduced no evidence raising triable issues of fact regarding the existence or terms of the non-ERISA plans under which they claim benefits. The only evidence that has been adduced is a copy of an alleged "deferred compensation" plan titled the "Opus Annual Incentive Plan for Operating Subsidiaries." (T. Roberts Decl., Exh. 1.) Plaintiffs do not argue that their declaratory relief claim is based on this plan, and a facial reading of the contract indicates that it could not be since termination of an individual's employment with an Opus subsidiary extinguishes any right to payment under the plan. (*Id.*, Art VII, § 7.1). In any event, by failing to adduce evidence or argue the issue in their opposition, plaintiffs have abandoned any contention that their declaratory relief claim survives defendants' motion for summary judgment. See, e.g., *Jenkins v. County of Riverside*, 398 F.3d 1093, 1095 n. 4 (9th Cir.2005) ("Jenkins abandoned her other two claims by not raising them in opposition to the County's motion for summary judgment"); *Bookman v. Merrill Lynch*, No. 02 Civ. 1108(RJS), 2009 WL 1360673, *10 (S.D.N.Y. May 14, 2009) ("Plaintiff's failure to oppose Defendant's motion on these grounds constitutes an abandonment of the claims for which he chose to offer neither legal argument nor evidentiary support"); *Foster v. City of Fresno*, 392 F.Supp.2d 1140, 1147 n. 7 (E.D.Cal.2005) ("[F]ailure of a party to address a claim in an opposition to a motion for summary judgment may constitute a waiver

not dispute that the plans—whether covered by ERISA or not—were unfunded plans, and that the payment of benefits under those plans was to come from Opus West's general assets. Federal courts have examined the analogous question of whether benefits owed under top hat plans are "withheld by an employer from the wages of employees" for purposes of § 541(b)(7) of the Bankruptcy Code. See 11 U.S.C. § 541(b)(7)(A) (stating that "[p]roperty of the estate does not include . . . any amount withheld by an employer from the wages of employees for payment as contributions"). Courts have generally concluded that since top hat plans are unfunded and benefits under them are payable from a corporation's general assets, benefits "due" under the plans are property of the bankruptcy estate, not the participants. The courts' reasoning is highly instructive here. See *In re Downey Medical Center–Hosp., Inc.*, 441 B.R. 120, 131 (9th Cir. BAP 2010) (finding problematic the "exclu[sion of] the assets of a top hat plan from [the] property of the estate," because such a holding "effectively would . . . remove[ ] [the assets] from the reach of the employer's general unsecured creditors"; because, given that such plans "specifically provide[ ] that the participants ha[ve] no ownership interest in the funds[,] . . . removing the plan funds from the estate would not establish ownership in the participants"; and "[b]ecause [given that] the participants ha[ve] nothing more than unsecured contractual claims against the estate, excluding the plan assets from the estate would merely reduce the assets available to satisfy the participants' claims"); *In re The Colonial BancGroup,*

*Inc.,* 436 B.R. 695, 712 (Bankr.M.D.Ala. June 25, 2010) ("By definition, amounts deferred into an unfunded plan remain part of the general assets of the company subject to the claims of general unsecured creditors. . . . To exclude the assets of an unfunded plan from property of the estate and remove those assets from the reach of general unsecured creditors would therefore fly in the face of the very purpose, structure and function of a top hat plan. It would place 11 U.S.C. § 541(b)(7) at odds with ERISA and essentially nullify a top hat plan in the bankruptcy context. It would upend the policy of ERISA and the tax law that the deferred amounts in a top hat plan remain part of the general assets of the company subject to the claims of its general creditors. . . . Further, if the plan assets are excluded from property of the estate, it would not give the plan participants any greater claim to the funds than they now have. The plan and trust are very clear that the participants have no ownership interest (legal or equitable) in the plan assets and have only a contractual, unsecured claim against the debtor. In fact, excluding the assets from property of the estate in the bankruptcy context would effectively remove the assets beyond the reach of the participants"); *In re Bill Heard Enterprises, Inc.,* 419 B.R. 858 (Bankr.N.D.Ala.2009) ("Unlike participants involved in traditional ERISA qualified plans, these key executives assumed the risks involved in deferring compensation under plans which expressly provided that '[a]ny assets held by the trust will be subject to the claims of [BHE's] general creditors under federal and state law in the Event of Insolvency.' Under these

of that claim") *Cambridge Electronics Corp. v. MGA Electronics, Inc.,* 227 F.R.D. 313, 336 n. 67 (C.D.Cal.2004) (citing *Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir.1995) for the proposition that "[t]here is no burden upon the district court to distill

every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the Parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned").

circumstances, the Court finds that the defendants never actually possessed the income deferred under these top hat plans and, therefore, the funds are not excluded from property of the estate under § 541(b)(7) as 'any amount—withheld by an employer from the wages of employees,' or 'received by an employer from employees for payment as contributions' to an ERISA qualified plan."); *Alfa Laval, Inc. v. Nichols,* Civil No. 3:06CV306, 2007 WL 984111, *10 (E.D.Va. Mar. 29, 2007) (" 'If there is no separately maintained account distinct from the company's general assets, then the plan is unfunded.' *Guiragoss v. Khoury,* 444 F.Supp.2d 649, 660 (E.D.Va. 2006). 'Thus, participants of unfunded plans have no preferred claim or ownership interest in plan assets, because there are no designated plan assets. The rights of an unfunded plan participant are equivalent to those of an unsecured creditor of the employer's general assets.' " Sally Lerner Gallati, Note, *The ERISA Hokey–Pokey: You Put Your Top Hat In, You Put Your Top Hat Out,* 5 NEV. L.J. 587, 590 n. 22 (2004) (citing *Demery v. Extebank Deferred Comp. Plan (B),* 216 F.3d 283, 287 (2d Cir.2000))); see also *In re New Century Holdings, Inc.,* 387 B.R. 95, 114 (Bankr. D.Del.2008) (declining to rule on the issue as premature, but observing that "[a]n annual deferral of income strikes this Court as potentially very different from a 'with-

holding' or an 'amount received by an employer from employees.' The latter two categories imply that the employee possessed the income at some point, whereas a deferral of income implies that the employee agreed to receive the income at a later date and never actually possessed it").[113]

Other courts have concluded that the unfunded nature of top hat plans prevents the imposition of a constructive trust, since deferred compensation to be paid pursuant to such plans cannot be "identified" as belonging to the plan participants. See *In re Washington Mut., Inc.,* 450 B.R. 490, 502–03 (Bankr.D.Del. June 1, 2011) ("The Debtors argue, however, that a constructive trust may be imposed only where 'money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession.' In this case the Debtors argue that because the Ahmanson Plans were unfunded and the funds in the Trusts were clearly identified as property of the Debtors, no such tracing is possible.... In this case, because of the essential requirement that the top hat plans be unfunded, there is no nexus or property identifiably belonging to the Plan Participants on which a constructive trust can be placed to remedy the refusal of the Debtors to pay their bene-

---

113. Although these cases largely predate defendants' motion to enforce the bankruptcy court's injunction, plaintiffs did not address any of this authority in their opposition to that motion. Instead, citing 11 U.S.C. § 541(a)(7), they asserted that their "pension funds belong[ed] to them and them alone and [that they were] not technically property of the estate." (Plaintiffs' Opposition to Opus Defendants' Motion at 6.) Plaintiffs argued that Opus West would "be entitled [only] to any residual assets of the pension plan[s] upon termination and after allocation of plan assets among the employee participants and beneficiaries." (*Id.*) The citations that fol-

lowed this sentence concerned *funded* pension plans, which receive markedly different treatment under ERISA. See, e.g., *Creasy v. Coleman Furniture Corporation,* 763 F.2d 656, 662 (4th Cir.1985) (addressing an ERISA pension fund, not an unfunded top hat plan); *In re Wingspread Corporation,* 155 B.R. 658, 663 (Bankr.S.D.N.Y.1993) (addressing a funded, not an unfunded, ERISA plan). While none of this authority was binding on the bankruptcy court, plaintiffs' failure to cite and distinguish the body of contrary case law and their implicit mischaracterization of the benefits plans is notable.

fits. Therefore, the Court concludes that the Plan Participants' claim for a constructive trust must fail. Their claims will be allowed as general unsecured claims because they do not have a right to the funds in the Ahmanson Trusts that is superior to the rights of the other general unsecured creditors" (internal citations omitted)); *Fenwick v. Merrill Lynch & Co., Inc.*, No. 3:06cv880 (WWE), 2009 WL 995760, *3 (D.Conn. Apr. 9, 2009) (striking a request for imposition of a constructive trust from the prayer for relief and observing that "[a] constructive trust may be imposed where 'money or property identified as belonging in good conscience' to plaintiff can be clearly 'traced to particular funds or property in the defendant's possession.' *Great–West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002). In this instance, the AE Plan was unfunded, plaintiffs made no contributions to it, and defendants have not improperly taken an identifiable portion of the beneficiaries' funds.").

The court recognizes that following the ruling on defendants' motion to dismiss, plaintiffs' state law claims remain viable only to the extent they concern non-ERISA deferred compensation plans. It is undisputed, however, that all of the benefits and deferred compensation allegedly owed—whether under an ERISA or non-ERISA plan—were unfunded and were to be paid from Opus West's general assets.[114] See *In re Marketing Services, LLC*, 309 B.R. at 788 ("An action is deriva-tive of the corporation's rights, and hence not independent of them, if 'the gravamen of the complaint is injury to the corporation ... or it seeks to recover assets for the corporation or to prevent the dissipation of its assets' " (citations omitted)). See also *Wooten v. Loshbough*, 951 F.2d 768, 771 (7th Cir.1991) ("[A]ll [defendants] are alleged to have done is to take money from the corporation that the corporation owed Wooten (and others), and that harm can be fully rectified by a suit by the corporation, *which is to say by its trustee in bankruptcy.* To allow Wooten to sue would be to permit a double recovery of damages—and this under a statute that already requires that any damages judgment be trebled" (emphasis added)). Cf. *Steinberg*, 40 F.3d at 893 ("[T]here is a difference between a creditor's interest in the claims of the corporation against a third party, which are enforced by the trustee, and the creditor's own direct—*not derivative*—claim against the third party, *which only the creditor himself can enforce* " (emphasis added)).

Plaintiffs are pursuing claims in the bankruptcy court for sums they were allegedly owed under the various compensation and incentive plans. As they have no status beyond that of general unsecured creditors, and the claims they assert in this action seek to recover money that Opus West allegedly transferred fraudulently to defendants, the bankruptcy court is the proper venue for the claims,

---

114. SGI, ¶ 19 (stating that plaintiffs do not dispute that "[t]he essential feature of all the plans is that they were unfunded by design" (emphasis omitted)); see also W.T. Decl., Exh. L ("T. Roberts' Responses to Defendants' First Set of Interrogatories and Requests for Admission"), No. 6 (admitting that the "[a]mounts you allege are owed to you by Opus West in paragraphs 31(a)-(p) of the Complaint are not subject to the funding rules under ERISA, Title I, Part 3).

Although plaintiffs consistently characterize the benefits as "wages," they proffer no evidence that the benefits were funded or that they were paid from an account that plaintiffs controlled or in which they had an ownership interest. Consequently, plaintiffs have failed to raise triable issues of fact regarding the unfunded nature of the benefits programs.

and the bankruptcy estate is the proper plaintiff. Consequently, the court enters summary judgment in defendants' favor on plaintiffs' intentional interference with contract, inducing breach of contract, unjust enrichment, and declaratory relief claims to the extent they seek the return of non-ERISA benefits. When a creditor suffers injury that is "independent of the firm's fate," his injury is direct and he may pursue his own remedy; otherwise the injury is derivative and the creditor must take his "place in line" in the bankruptcy action. *Hamid v. Price Waterhouse*, 51 F.3d 1411, 1420 (9th Cir.1995).[115]

## C. Whether Plaintiffs' UCL Claims Must Be Dismissed

Defendants raise an additional argument regarding plaintiffs' UCL claim. They assert that a plaintiff cannot recover damages under the UCL, but only restitution of money or property, and thus that plaintiffs can only seek restitution of funds in which they had an ownership interest.[116] Plaintiffs' third cause of action seeks restitution and disgorgement of all funds unlawfully acquired by defendants, as well as injunctive relief similar to that sought on the intentional interference with contract and inducing breach of contract claims.[117]

Under the UCL, any person or entity that has engaged, is engaging, or threatens to engage "in unfair competition may be enjoined in any court of competent jurisdiction." CAL. BUS. & PROF.CODE §§ 17201, 17203. "Unfair competition" includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." *Id.,* § 17200. The California Supreme Court has construed the term broadly. See *Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.,* 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999) ("[Section 17200] defines 'unfair competition to include any unlawful, unfair or fraudulent business act or practice.... Its coverage is sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law.... By proscribing any unlawful business practice, section 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable.... However, the law does more than just borrow. The statutory language referring to any unlawful, unfair or fraudulent practice ... makes clear that a practice may be deemed unfair even if not specifically proscribed by some other law. Because Business and Professions Code section 17200 is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent" (internal quotations omitted)); see also *Paulus v. Bob Lynch Ford, Inc.,* 139 Cal.App.4th 659, 676–77, 43 Cal.Rptr.3d 148 (2006) ("The purpose of the UCL 'is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services....' Thus,

---

**115.** Defendants also contend that plaintiffs "lack standing because their injuries are, at best, indirectly related to defendants' alleged misconduct." (Reply at 6.) The court construes this argument as a challenge to plaintiffs' standing on prudential grounds. See *Pony v. County of Los Angeles,* 433 F.3d 1138, 1146 (9th Cir.2006) ("Generally, a plaintiff may only bring a claim on his own behalf, and may not raise claims based on the rights of another party"). Given the court's conclusion that plaintiffs' state law claims are barred under the Chapter 11 plan and the bankruptcy court's injunction, and that they are the property of the bankruptcy estate, the court need not address this argument.

**116.** Motion at 24.

**117.** FAC at 35–36.

the scope of the UCL (Bus. & Prof.Code, § 17200 et seq.) is 'broad.' It 'covers a wide range of conduct'" (citations and footnote omitted)).

 The parties dispute whether plaintiffs have raised triable issues of fact as to whether defendants engaged in fraudulent conduct. Defendants assert that the dividend payments and money transfers Opus West made to them were lawful payments approved by Opus West's board of directors (which included plaintiff T. Roberts, who occupied a board seat as CEO). Plaintiffs counter that the transfers were fraudulent because they helped Opus West deceive its banks and caused them to believe that the company was maintaining the debt-to-equity ratios required by its loan covenants.[118] While plaintiffs may be correct that there are factual disputes surrounding this question, plaintiffs' UCL claim fails on other grounds as a matter of law. As the court's analysis of the unfunded nature of plaintiffs' interest in the compensation and incentive plans indicates, they have failed to establish that they have any ownership interest in the specific property that Opus West transferred to defendants.

 Under the UCL, plaintiffs cannot recover damages, but are limited to injunctive relief and restitution. *Cel–Tech Communications,* 20 Cal.4th at 179, 83 Cal. Rptr.2d 548, 973 P.2d 527 ("Prevailing plaintiffs are generally limited to injunctive relief and restitution.... Plaintiffs may not receive damages, much less treble damages, or attorney fees"); *Bank of the West v. Superior Court,* 2 Cal.4th 1254, 1266, 10 Cal.Rptr.2d 538, 833 P.2d 545 (1992) ("The only nonpunitive monetary relief available under the Unfair Business Practices Act is the disgorgement of money that has been wrongfully obtained or, in

the language of the statute, an order "restor[ing] ... money ... which may have been acquired by means of ... unfair competition," quoting CAL. BUS. & PROF.CODE § 17203); see also *Cambridge Electronics Corp. v. MGA Electronics, Inc.,* 227 F.R.D. 313, 336 (C.D.Cal.2004) ("Additionally, it may be ordered to make restitution of money or property that may have been acquired by means of the unfair competition").

 Under the statute, restitution means "compelling a UCL defendant to return money obtained through an unfair business practice ... to persons who had an ownership interest in the property." *Kraus v. Trinity Management Services,* 23 Cal.4th 116, 126–27, 96 Cal.Rptr.2d 485, 999 P.2d 718 (2000), superseded by statute on other grounds as recognized in *Arias v. Superior Court,* 46 Cal.4th 969, 95 Cal. Rptr.3d 588, 209 P.3d 923 (2009); *Korea Supply Co. v. Lockheed Martin Corp.,* 29 Cal.4th 1134, 1149, 131 Cal.Rptr.2d 29, 63 P.3d 937 (2003) ("The object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest.... The remedy sought by plaintiff in this case is not restitutionary because plaintiff does not have an ownership interest in the money it seeks to recover from defendants"). While restitution is broad enough to encompass funds in which a person had a "vested interest," such as unpaid wages, it is not available where plaintiff claims only an "attenuated expectancy interest" that cannot be "traced to any particular funds in [defendants'] possession ..." *Id.* at 1149–50, 131 Cal.Rptr.2d 29, 63 P.3d 937.

The court's analysis here is guided by its conclusion regarding plaintiffs' other state law claims. See *Colonial BancGroup, Inc.,* 436 B.R. at 707 n. 19 (holding that a

118. Opp. at 24.

"vested" interest in top hat plan did not create an interest in particular funds because the plan was, by definition, unfunded); see also *Resolution Trust Corp. v. MacKenzie*, 60 F.3d 972, 977 (2d Cir.1995) ("At the time the Claimants made their demand for payment, they were merely general unsecured creditors of Columbia. Rightly or wrongly, the Plan assets remained in the grantor trust held by Norstar, thus Columbia's property, at the time RTC was appointed Receiver for Columbia").

While plaintiffs consistently characterize their bonus and benefits plans as "earned wages,"[119] they proffer no evidence supporting that contention. See *Cambridge Electronics Corp.*, 227 F.R.D. at 331 ("Under the law governing motions for summary judgment ... if a party moving for summary judgment does not bear the burden of proof at trial on a claim, it need only "inform[ ] the district court of the basis for its motion," " quoting *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548); see also *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir.2000) (holding that the *Celotex* "showing" can be made by "pointing out through argument ... the absence of evidence to support plaintiff's claim"); *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1107 (9th Cir. 2000) (holding that once the moving party carries its initial burden of production, "the nonmoving parties were obligated to produce evidence in response").

Instead, it is undisputed that all of the compensation and incentive plans were unfunded, that no funds were ever withdrawn or withheld from plaintiffs' paychecks or other earnings for deposit into the plans, and that any benefits paid to plaintiffs were to come from Opus West's general assets. Plaintiffs have adduced no evidence that they had an ownership interest in specific property; indeed, the evidence and testimony they have proffered indicates the opposite—that their benefits were unfunded, were to be paid from the corporation's general assets, and were never designated "wages."

Because plaintiffs have adduced no evidence that they had an ownership interest in specific property that was transferred to defendants, they cannot obtain restitution under the UCL.

### D. Whether Opus Corporation and Opus LLC Are Parties to the ERISA Benefits Plans

#### 1. Legal Standard Governing Interpretation of ERISA Plans

Defendants also seek summary judgment on plaintiffs' ERISA claims as respects two of the benefits plans. Plaintiffs allege that "[d]efendants Opus [Corp.] and Opus LLC established certain top hat plans for Plaintiffs" that were classified as ERISA plans.[120] They seek benefits allegedly owed under two of the plans, the Opus 80/20 Plan and the Presidents Plan.[121] Plaintiffs contend that "Opus [Corp.] and Opus LLC are parties to the deferred compensation plans and pension plans." As a consequence, they seek to recover the benefits allegedly due from those defendants.[122] Defendants assert that although the plans refer to Opus Corp. and Opus LLC, and although those entities played a role in administering the plans, neither company is obligated to pay benefits under them.

---

119. Opp. at 24.

120. FAC, ¶ 117.

121. *Id.*

122. *Id.*, ¶ 118.

■ Both parties agree that resolution of this dispute is controlled by the plan terms. Defendants assert that the plan language unambiguously indicates that Opus Corp. and Opus LLC are not obligated to pay benefits, while plaintiffs contend that the relevant terms are ambiguous and that extrinsic evidence is needed to clarify the parties' intent. Section 402(a)(1) of ERISA requires that "[e]very employee benefit plan ... be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1). "Whether the terms of a plan are plain or ambiguous is a question of law that [is] ... review[ed] *de novo.*" *McDaniel v. Chevron Corp.,* 203 F.3d 1099, 1110 (9th Cir.2000).

■ "ERISA does not contain a body of contract law to govern the interpretation and enforcement of employee benefit plans.... Rather, Congress intended that courts apply contract principles derived from state law but be guided by the policies expressed in ERISA and other federal labor laws." *Richardson v. Pension Plan of Bethlehem Steel Corp.,* 112 F.3d 982, 985 (9th Cir.1997). The terms of an ERISA plan should be "interpreted 'in an ordinary and popular sense as would a [person] of average intelligence and experience.'" *Id.* (quoting *Evans v. Safeco Life Ins. Co.,* 916 F.2d 1437, 1441 (9th Cir.1990) (quoting in turn *Allstate Ins. Co. v. Ellison,* 757 F.2d 1042, 1044 (9th Cir.1985))). "When disputes arise as to the meaning of one or more terms, we first look to the explicit language of the agree-ment to determine the clear intent of the parties." *McDaniel,* 203 F.3d at 1110; see also *Ingram v. Martin Marietta Long Term Disability Income Plan,* 244 F.3d 1109, 1113 (9th Cir.2001) (examining first the language of an ERISA plan to determine whether its terms were unambiguous). "Each provision in an agreement should be construed consistently with the entire document such that no provision is rendered nugatory." *Richardson,* 112 F.3d at 985; see also *Armistead v. Vernitron Corp.,* 944 F.2d 1287, 1293 (6th Cir. 1991) ("The intended meaning of even the most explicit language can, of course, only be understood in the light of the context that gave rise to its inclusion").

■ A plan term is ambiguous if it is "subject to reasonable alternative interpretations." *Vizcaino v. Microsoft Corp.,* 97 F.3d 1187, 1194 (9th Cir.1996) (quoting *Hickey v. A.E. Staley Mfg.,* 995 F.2d 1385, 1389 (7th Cir.1993)); see also *Tzung v. State Farm Fire and Cas. Co.,* 873 F.2d 1338, 1340 (9th Cir.1989) (holding that an insurance contract "is ambiguous if the court finds that the language is susceptible to different interpretations"). "When a plan is ambiguous on its face, [the court] may, and typically do[es], consider extrinsic evidence to interpret it." *Vizcaino,* 97 F.3d at 1194; see also *McDaniel,* 203 F.3d at 1114 n. 10 ("Nothing in the law of this circuit prohibits a plan administrator from resorting to extrinsic evidence when construing ambiguous plan provisions").[123] A court may not create ambiguity through

---

**123.** Plaintiffs invoke the rule of *contra proferentem,* which requires that ambiguities in a contract be construed against the drafter. The Ninth Circuit has applied this doctrine in interpreting ERISA benefits contracts, noting that "[i]f an ambiguity exists, [a court] must resolve it in favor of the insured." *Babikian v. Paul Revere Life Ins. Co.,* 63 F.3d 837, 840 (9th Cir.1995). The cases plaintiffs cite in support of the doctrine's application, however, concern insurance contracts. See *id.* at 840; *Barnes v. Independent Automobile Dealers Ass'n of Cal. Health and Welfare Benefit Plan,* 64 F.3d 1389, 1393 (9th Cir.1995) (addressing a self-funded group medical plan that was akin to group insurance, and stating that "[w]e must construe ambiguities in an ERISA plan against the drafter and in favor of the insured"); see also *Kunin v. Benefit Trust Life Ins. Co.,* 910 F.2d 534, 540 (9th Cir.1990) ("Insurance policies are almost always drafted by specialists employed by the insurer. In

the use of extrinsic evidence, however. If the plan terms are clear on their face, the court must disregard such evidence. *Pierce County Hotel Employees and Restaurant Employees Health Trust v. Elks Lodge, B.P.O.E. No. 1450,* 827 F.2d 1324, 1327 (9th Cir.1987) (noting that "[e]xtrinsic evidence is inadmissible to contradict a clear contract term," and holding that because the agreements in question were unambiguous, the lower "court correctly disregarded extrinsic evidence of the parties' intent"); see also *Cinelli v. Security Pacific Corp.,* 61 F.3d 1437, 1444 (9th Cir. 1995) ("Because the Board Resolution is not a plan document, a consideration of the language of the resolution is precluded unless the terms of the Supplemental Plan are ambiguous as to termination"); *N.W. Adm'rs, Inc. v. Sacramento Stucco,* 86 F.Supp.2d 974, 979 (N.D.Cal.2000) ("[E]xtrinsic evidence [is] irrelevant to the initial finding whether the [contracts] are ambiguous").

■■■ Nor can a court manufacture ambiguity in a contract through a "strained instead of [a] reasonable interpretation" of its terms. *Tzung,* 873 F.2d at 1340 (quoting *Highlands Ins. Co. v. Universal Underwriters Ins. Co.,* 92 Cal.App.3d 171, 175, 154 Cal.Rptr. 683 (1979)); *Evans,* 916 F.2d at 1441 ("We will not artificially create ambiguity where none exists. If a reasonable interpretation favors the insurer and any other interpretation would be strained, no compulsion exists to torture or twist the language of the policy").

Defendants contend that the language of the 80/20 Plan and the Presidents Plan (or

light of the drafters' expertise and experience, the insurer should be expected to set forth any limitations on its liability clearly enough for a common layperson to understand; if it fails to do this, it should not be allowed to take advantage of the very ambiguities that it could have prevented with greater diligence").

The policy justification for applying this rule in the insurance context, where plan participants are "common laypeople" who are unlikely to understand the intricacies of insuring agreements, are clearer than they are in this case. Top hat plans are exempt from many of ERISA's requirements precisely because participants in top hat plans stand in a significantly stronger bargaining position than most regular employees, due to their experience, level of power within the company, and supposed sophistication. See *Alexander v. Brigham and Women's Physicians Organization, Inc.,* 513 F.3d 37, 46 (1st Cir. 2008) ("The origins of the top-hat provision lie in Congress's insight that high-echelon employees, unlike their rank-and-file counterparts, are capable of protecting their own pension interests"); *Demery v. Extebank Deferred Compensation Plan (B),* 216 F.3d 283, 289 (2d Cir.2000) ("Ability to negotiate is an important component of top hat plans; we have noted that top hat plans have been exempted from ERISA's substantive requirements 'because Congress deemed top-level management, unlike most employees, to be capable of protecting their own pension expectations.' Congress approved of a lesser level of regulation for top hat plans 'on the premise that the employer's top-level executives have sufficient influence within the institution to negotiate arrangements that protect against the diminution of their expected pensions,' " quoting *Gallione v. Flaherty,* 70 F.3d 724, 727 (2d Cir.1995)); *In re New Valley Corp.,* 89 F.3d 143, 148 (3d Cir.1996) ("The dominant characteristic of the special top hat regime is the near-complete exemption of top hat plans from ERISA's substantive requirements").

Consequently, applying the rule of *contra proferentem,* developed in a substantially different factual context where it serves important policy rationales, would be inappropriate here. Cf. *Spacek v. Maritime Ass'n,* 134 F.3d 283, 299 n. 14 (5th Cir.1998) (noting that although the "court ha[d] on several occasions held that the doctrine of *contra proferentem* applies in construing ERISA plans," it had "done so only in construing insurance policies governed by ERISA," and declining to "resolve the issue of whether *contra proferentem* applies outside the insurance context"), abrogated on other grounds in *Central Laborers' Pension Fund v. Heinz,* 541 U.S. 739, 124 S.Ct. 2230, 159 L.Ed.2d 46 (2004).

"Presidents Deferred Compensation Plan")[124] is clear, and that the only reasonable interpretation of the language is that plaintiffs' "employer," Opus West, is the sole obligor under the plans. Plaintiffs assert that the plans' language is ambiguous, and that extrinsic evidence, including prior versions of the plans, should be used to interpret the terms and to discern the parties' intent.

### 2. Whether Opus Corp. and Opus LLC Have Payment Obligations Under the 80/20 Plan

■ The 80/20 Plan is designed to "provide additional future compensation to certain highly compensated employees through deferral of certain Incentive Compensation."[125] It contains references to certain "Companies," which it identifies as "Opus Corporation, a Minnesota corporation, and Opus L.L.C., a Minnesota limited liability company." The plan notes that each of these entities is "sometimes referred to as the 'Company.'"[126] Defendants rely heavily on the Section 4.4 of the plan, which states:

> "*Unsecured Obligations.* A Participant's credits in his or her Account shall be an unsecured obligation of *the respective Company (or subsidiary or affiliate)* to pay the Participant (or the Participant's Beneficiary, in the event of the Participant's death) that actual amount of the credits at the time designated in Article V. *Each Participant or Beneficiary is only a general creditor of the Company (or subsidiary or affiliate) with respect to his or her Account.* Accounts are maintained for recordkeeping purposes only. Notwithstanding the foregoing, *obligations of the Companies (or their subsidiaries) to pay benefits under this plan* may be satisfied by distributions from a grantor trust created by the Companies in their sole discretion for such purposes. If the Companies obtain an insurance contract in connection with their obligations under this Plan, each participant shall cooperate with the Company and shall execute any documents reasonably required by the Company to obtain such coverage."[127]

Defendants argue that this provision clearly establishes that only a participant's "*respective* Company (or subsidiary or affiliate)," i.e., the participant's employer, is obligated to make payments under the plan. They contend that other provisions of the plan support the view that the participant's employment relationship with his or her "respective Company (or subsidiary or affiliate)" defines the payment obligation. See *Babikian*, 63 F.3d at 840 (interpreting an ERISA plan "as a whole"). Specifically, they cite the purpose clause, which states that the intent of the plan is to provide compensation to "employees." They also cite the fact that plan eligibility is contingent on the participant's status as an "employee."[128] As plaintiffs were Opus

124. FAC, ¶ 117.

125. 80/20 Plan, Art. I, § 1.2.

126. *Id.*, § 1.4.

127. *Id.*, Art. IV, § 4.4 (emphasis added).

128. *Id.*, Art. III, § 3.1 ("An employee of a Company (or a subsidiary or affiliate of a Company) shall become a Participant in the Plan on the earliest date (on or after the Effective Date) on which he or she is Qualified Employee"); *id.* Art. II, § 2.9 ("Qualified Employee" ... means any officer employee of the Companies (or a subsidiary or affiliate of the Companies) who is designated by the [CEO] of his/her employer or by the President of a Company as eligible to participate in this Plan for the Plan Year"); *id.* § 2.12 (defining "Separation from Service" as "death, retirement, or other termination of employment," and noting that "[a] Participant's termination of employment will be a Separation from Service if the Participant

West (or Opus West Construction Corp.) employees, defendants assert that only Opus West was obligated to make payments to plaintiffs.

Plaintiffs counter that many key provisions of the plan do not state that only a participant's employer is obligated, and that the "Companies" have many rights and responsibilities under the plan, evidencing an intent that they too were obligated to pay benefits. Plaintiffs observe that Opus West is not specifically mentioned anywhere in the plan, and cite a number of provisions that describe the "Companies'" obligations to plan participants without specifying that it is the Companies' "subsidiary or affiliate" that is in fact obligated. Section 2.1, for example, states that "[a]n 'Account' shall be established for each eligible Participant reflecting the deferred Incentive Compensation owed to the Participant ...," and that "[t]he Companies will maintain sub-accounts for a Participant to reflect each Annual Award for each Plan Year and interest on that account." [129] Section 4.2 states that "[t]he deferred compensation credited to an Account under the Plan by a Company on behalf of a Participant for a Plan Year shall be allocated to the Account of the Participant...." [130] The plan requires that participants file a beneficiary designation with Opus Corporation, not with a "Company (or subsidiary or affiliate)," and states that the Companies are responsible for administering the plan and

have "discretionary authority to interpret the provisions of the Plan." [131]

The "Companies" may offset obligations to plan participants by any amounts the participants owe the "Company (or an affiliate or subsidiary)." [132] Finally, the plan vests power to amend or terminate the plan solely in "the Company," not in "subsidiaries or affiliates" of the Companies. [133] Plaintiffs contend that, at a minimum, the plan is ambiguous as to whether Opus Corp. and Opus LLC were obligated to make payments to plan participants. This, they contend, makes consideration of extrinsic evidence appropriate.

The court agrees with defendants that Section 4.4 is the key provision, since it is the provision that establishes which entity is obligated to make payments to participants under the plan. Most of the contract provisions cited by plaintiffs address a range of other obligations apparently assumed by the Companies; these provisions do not determine or control which entity is obligated to pay benefits to participants. The court cannot agree that Section 4.4 unambiguously supports defendants' construction of it, however. The first sentence states that "[a] Participant's credits in his or her Account shall be an unsecured obligation of the respective Company (or subsidiary or affiliate) to pay the Participant (or the Participant's Beneficiary, in the event of the Participant's death) the actual amount of the credits at the time designated in Article V." Defen-

---

and the Company reasonably anticipate that the Participant will perform no future services for the Company (or any subsidiary or affiliate of the Company) ...").

**129.** *Id.,* § 2.2.

**130.** *Id.,* Art. IV, § 4.2

**131.** *Id.,* Art. V, § 5.5, Art. VI, § 6.1; see also *id.,* § 6.2 (noting that claims should be filed

with the "Company" and omitting any reference to "subsidiaries or affiliates").

**132.** *Id.,* Art VIII, § 8.1; see also *id.* § 8.2 (stating that participants are presumed mentally competent until the "Company" receives written notice and that the "Company" may direct benefits payments to a participant's guardian or conservator).

**133.** *Id.,* Art VII, §§ 7.1–7.2.

dants contend that the word "respective," which precedes "Company (or subsidiary or affiliate)," refers to the employment relationship between a participant and the Company, subsidiary or affiliate for which he or she worked. The term "or" is disjunctive, indicating that only one "Company or subsidiary or affiliate" is obligated to pay. Cf. *United States v. Gallegos*, 613 F.3d 1211, 1215 (9th Cir.2010) (noting, in the statutory interpretation context, that "[w]e have consistently defined 'or' as indicating separate alternatives"); *Azure v. Morton*, 514 F.2d 897, 900 (9th Cir.1975) ("As a general rule, the use of a disjunctive in a statute indicates alternatives and requires that they be treated separately. Here the disjunctive form 'or' sets off subsection (a) from (b) and fashions two categories of eligibility" (internal citations omitted)). Defendants assert that in combination "respective" and "or" mean that *only* the entity for which the participant worked is obligated to pay. This interpretation is reasonable, especially in light of other plan provisions that contain analogous language. Section 3.1, for example, which concerns eligibility to participate in the plan, states that an "employee of a Company (or a subsidiary or affiliate of a Company) shall become a Participant in the Plan on the earliest date ... on which he or she is a Qualified Employee." [134] The provision clearly ties the right to receive benefits to a participant's employment relationship with a particular entity.

The provision is susceptible of other reasonable interpretations, however. The provision states that a "Participant's credits in his or her Account shall be an unsecured obligation of the respective Company (or subsidiary or affiliate) ...." [135] Read in context with the rest of the sentence, the word "respective" that precedes "Company (or subsidiary or affiliate)" could just as easily refer to "the respective Company (or subsidiary or affiliate)" that maintains the participant's account. This interpretation is reinforced by the subsequent sentence, which states that "[e]ach Participant or Beneficiary is only a general creditor of the Company (or subsidiary or affiliate) with respect to his or her Account," [136] suggesting that the entity that maintains the "Account" is the entity obligated to make payments. "Account" is clearly defined in Section 2.1 of the plan, which states that an "Account" "shall be established for each eligible Participant reflecting the deferred Incentive Compensation owed to the Participant ... under the terms of this Plan." [137] That section also states that "[t]he Companies will maintain sub-accounts for a Participant to reflect each Annual Award for each Plan Year." When this provision is read in combination with Section 4.4, it supports the view that Section 4.4 means that payments under the plan are unsecured obligations of the entities that maintain accounts for participants. [138]

**134.** 80/20 Plan, Art. III, § 3.1.

**135.** 80/20 Plan, Art IV, § 4.4.

**136.** *Id.*

**137.** Art II, § 2.1.

**138.** Defendants cite *Mertens v. Hewitt Associates*, 948 F.2d 607 (9th Cir.1991), aff'd, *Mertens v. Hewitt Associates*, 508 U.S. 248, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993), for the proposition that a provision that requires

Opus Corp. to perform certain "administrative tasks" does not obligate it to perform other tasks, such as paying benefits. (Reply at 12.) *Mertens* is not particularly apposite, since it addressed whether an actuary that performed actuarial services for a plan was a fiduciary of the plan that could be held liable under ERISA. *Id.* at 609. Here, the court confronts a contract interpretation question, where the parties' respective obligations and rights are defined by the language of the plan document, not by an entity's performance of duties independent of the contract.

Consequently, the court concludes that the plan language is susceptible of at least two reasonable interpretations. Given the ambiguity in the plan, it is appropriate to consider extrinsic evidence in interpreting it. The most relevant evidence is the parties' prior course of conduct in performing the contract, and the fact that plaintiffs have submitted unsecured claims for the benefits owed in Opus West's bankruptcy proceeding.

It is undisputed that neither Opus Corp. nor Opus LLC ever paid compensation to plaintiffs; any payments under the plans were made by Opus West, their employer.[139] See *Jung v. FMC Corp.*, 755 F.2d 708, 713 (9th Cir.1985) (interpreting a plan in light of the "practice in other similar instances" and the "uniform practice"), abrogated on other grounds as recognized in *Dytrt v. Mountain States Tel. & Tel. Co.*, 921 F.2d 889, 894 n. 4 (9th Cir.1990). The fact that plaintiffs have filed unsecured claims in Opus West's bankruptcy proceeding is further evidence that they understand that it is that entity that is required to pay their deferred compensation. They would not have filed these claims if they thought that a different entity was responsible for paying the compensation. Consequently, the parties' prior course of dealings, as well as plaintiffs' apparent belief that payments due under the 80/20 Plan were to be made from the assets of Opus West, weigh in favor of interpreting Section 4.4 to state that Opus West, plaintiffs' employer, was solely obligated to make payments of deferred compensation.

Plaintiffs, however, have proffered evidence that raises triable issues of fact regarding proper interpretation of the plan, i.e., documents and correspondence from employees of Opus Corp. regarding the administration of the benefits plan,[140] as well as prior versions of the plan.[141] Plaintiffs cite the fact that the documents and correspondence are printed on Opus Corp. letterhead, are sent by Opus Corp. employees, and reference "our deferred compensation programs."[142] They also cite language in a document titled "Incentive Compensation James Fritcher, Calendar Year 2008," which concerns payments owed to Fritcher under the 80/20 Plan.[143] This document states that the "[e]mployee must be employed by the Opus Group of Companies at the time cash incentives are paid. If an employee is no longer employed by the company for any reason, there will be no obligation for the company to pay any incentive under this plan...."[144] The inference plaintiffs wish the court to draw from this evidence is rather weak. Although plaintiffs contend that "the company" refers to Opus Corp., that interpretation is not compelled by the language. Rather, it appears that "the company" refers to whichever member of the "Opus Group of Companies" employed Fritcher. In addition, the document's repeated references to Opus West and Opus West Construction Corp., which employed Fritcher, undercut the conclusion that "the company" refers to any entity other than Opus West.[145] Cf. *CIGNA Corp. v. Amara*, ––– U.S. –––, 131 S.Ct. 1866, 1878, 179 L.Ed.2d 843 (2011) ("summary documents ... do not themselves constitute the terms of the plan"). The court's duty here, however, is not to weigh conflicting evidence

**139.** Defs.' SUF, ¶ 45; Pls.' SGI, ¶ 45; Power Decl., ¶¶ 1–13.

**140.** Fritcher Decl., Exhs. 1, 2, 4.

**141.** *Id.*, Exhs. 3, 7.

**142.** *Id.*, Exh. 1.

**143.** *Id.*, ¶ 9, Exh. 4.

**144.** Fritcher Decl., Exh. 4 at PL 000239.

**145.** *Id.*

and make determinations as to what the ultimate conclusion will be following trial on the merits. It is only to determine whether the nonmoving party has adduced evidence sufficient to permit a reasonable factfinder to decide in their favor.

In further support of their arguments, plaintiffs proffer Opus West's SAR Plan, which contains markedly different language than that found in the ERISA plans. The SAR Plan clearly delineates that only Opus West is obligated to make payments under the plan. It designates to Opus West as the "Company" and makes no reference to Opus Corp. or Opus LLC.[146] Plaintiffs argue that this alternate plan language demonstrate that when defendants wished to provide that only Opus West was obligated to make payments under a plan, they knew how to do so. The fact that the language of the 80/20 Plan is by comparison unclear raises triable issues of fact regarding the parties' intent. Cf. *Ben–Trei Overseas, L.L.C. v. Gerdau Ameristeel US, Inc.*, No. 09–CV–153–TCK–TLW, 2010 WL 1410984, *12 (N.D.Okla. Mar. 31, 2010) (comparing the language of two sets of purchase orders, and determining that differences between them raised triable issues of fact as to whether they were issued pursuant to a fixed-quantity or requirements contract).

Consequently, the court concludes that plaintiffs have raised triable issues of fact as to whether Opus Corp. and Opus LLC owed payment obligations under the 80/20 Plan.

### 3. Whether the 80/20 Plan's Payment Obligations Run to Opus Corp. and Opus LLC

While the terms of the Presidents Plan do not differ significantly from those of the 80/20 Plan; they are marginally clearer.[147] Like the 80/20 Plan, the Presidents Plan defines "Companies" or "Company" as Opus Corp. and Opus LLC. The Presidents Plan also defines "Subsidiary," however, stating that the term means "the subsidiaries of the Companies that employ a Participant while such Participant is eligible for an Annual Award under this Plan." [148]

The Presidents Plan contains an *"Unsecured Obligations"* provision, which states:

"The Deferred Compensation Account of each Participant in the Plan shall be an unsecured obligation of the respective Company or Subsidiary to pay the Participant (or the Participant's Beneficiary, in the event of the Participant's death) the actual amount of the credits at the time designated in Article VIII. Each Participant or Beneficiary is only a general creditor of the Company or Subsidiary with respect to his or her Deferred Compensation Account. Deferred Compensation Accounts are maintained for recordkeeping purposes only. Notwithstanding the foregoing, obligations of the Companies (or their subsidiaries) to pay benefits under this Plan may be satisfied by distributions from a grantor trust created by the Companies in their sole discretion for such purpose."

This language is marginally more explicit than that of the 80/20 Plan, in that it links the "Deferred Compensation Account of each Participant" to the "respective Company or Subsidiary." This link is reinforced by the second sentence of the provi-

---

146. SAR Plan, Art II, § 2.7.

147. See discussion in factual background, *supra*, for explanation regarding multiple versions of alleged Presidents Plan.

148. *Id.*, Art. I, § 1.5.

sion, which states unambiguously that it is a participant's "Account" that confers unsecured creditor status on him or her, not an employment relationship or some other factor.

"Deferred Compensation Account" is defined in Section 2.4 of the plan in language that tracks the 80/20 Plan. The provision states that "[a] 'Deferred Compensation Account' shall be established for each eligible Participant reflecting the Annual Award owed to the Participant ... under the terms of this Plan. The Companies will maintain sub-accounts for a Participant to reflect each Annual Award for each Plan Year and interest on that account." [149]

As the plans are similar in language, however, the ambiguities the court found in the 80/20 Plan similarly affect the Presidents Plan. As with the 80/20 Plan, the provision detailing the purpose of the Presidents Plan states that the "Plan is designed to promote teamwork among the participating executives for the benefit of the companies. It is the further purpose of the Plan to attract and retain highly qualified persons for the successful conduct of their respective businesses." [150] The Presidents Plan contains language that similarly places the employment relationship between the participant and the Opus subsidiary at the heart of the plan's obligations, implying that the obligation to pay only runs from the participant to his or her employer.[151]

Given the similarities between the plans, the court's analysis of the 80/20 Plan guides its conclusion regarding the Presi-

dents Plan. While the parties' prior course of dealing, the fact that Opus West used its general assets to make payments under the Presidents Plan, and the fact that T. Roberts, the only plaintiff who asserts a claim under the plan, has filed an unsecured creditor claim in Opus West's bankruptcy proceeding, weigh in favor of defendants' proposed construction, plaintiffs have submitted some evidence contradicting that interpretation. T. Roberts asserts that an "original" version of the Presidents Plan does not state that obligations under the plan are unsecured, and contains ambiguities similar to those in the current version of the Presidents Plan related to Opus Corp. and Opus LLC's payment obligations.[152] He also proffers an alleged amendment to the original plan, which he received from Opus Corp. rather than Opus West.[153] While defendants contend that the purportedly "original" plan is in reality a prior, non-ERISA plan, the court cannot make credibility determinations or decide disputed issues of fact on a motion for summary judgment; ultimately, the factfinder will have to decide what the document is and whether T. Roberts' assertions are credible. In addition, as noted, the relatively clear language of the SAR Plan also raises triable issues of fact concerning proper interpretation of the Presidents Plan.

■ Consequently, the court determines that defendants have raised triable issues of fact regarding the Presidents Plan that preclude the entry of summary judgment in defendants' favor.[154]

---

149. Presidents Plan, Art. II, § 2.4.

150. *Id.,* Art I, § 1.1.

151. See, e.g., *id.,* Art. III, § 3.1, 3.4.

152. T. Roberts Decl., Exh. 2.

153. *Id.,* Exh. 3.

154. For the first time in reply, defendants argue that because Opus Corp. is the plan administrator, its interpretation of the plans is entitled to *Firestone* deference. See *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) (holding that courts must review challenges to an ERISA plan's denial of benefits *de novo* "unless the benefit plan gives the administrator

## III. CONCLUSION

For the reasons stated, the court grants defendants' motion for summary judgment on plaintiffs' remaining state law claims, but denies it as to plaintiffs' ERISA claims.

or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan"). The argument consumes only one page of defendants' reply, and plaintiffs, of course, have had no opportunity to respond to it. As noted, the court has discretion to disregard arguments raised for the first time in reply, since "[i]t is improper for the moving party to introduce new facts or different legal arguments in the reply brief than [those] presented in the moving papers." *Lerma v. Arends*, No. 1:11–cv–00533–LJO–MJS, 2011 WL 2516173, \*5 (E.D.Cal. June 22, 2011). Consequently, the court declines to address defendants' untimely argument.